**Nancy E. FORTNER, Plaintiff,**

v.

**STATE OF KANSAS, Defendant.**

No. 94–4208–SAC.

United States District Court,
D. Kansas.

June 10, 1996.

**1258**

Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, W. Thomas Stratton, Topeka, KS, for Nancy E. Fortner.

John J. Knoll, Office of the Attorney General, Topeka, KS, John R. Mettner, Jr., Kansas Air National Guard, Topeka, KS, Betty J. Mick, Lawrence, KS, for State of Kansas.

## MEMORANDUM AND ORDER

CROW, District Judge.

This employment discrimination case comes before the court on the defendant's motion for summary judgment. (Dk. 59). Ms. Fortner worked as security officer at Forbes Field in Topeka, Kansas, from September of 1990 until the fall of 1994. She brings this action alleging: (1) disparate treatment on the basis of sex in ordering her to wear her hair in a bun rather than a pony tail; (2) retaliation for filing and pursuing her administrative charges in which she had alleged discriminatory enforcement of hair style regulations; (3) hostile work environment; and (4) constructive discharge. The defendant moves for summary judgment on all of the plaintiff's claims.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment."

*Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evi-

dence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Thus, if the plaintiff's evidence fails to create any reasonable doubts about the employer's expressed lawful motive for taking the adverse employment action, summary judgment is proper. *Cone*, 14 F.3d at 530.

The defendant's statement of facts consists of eighty-six paragraphs, and the plaintiff adds another thirty-six paragraphs. The plaintiff does not controvert many of the defendant's facts, and the defendant has not filed a reply brief controverting the plaintiff's

facts. The court has selected the pertinent uncontroverted facts and states them in chronological order.

Hired in September of 1990, the plaintiff, Nancy Fortner, worked as a State Resource Protection Officer ("SRPO") at Forbes Field until she went on leave in September of 1994 followed by her resignation in March of 1995. Ms. Fortner served under Major Arthur E. Schaaf, Jr. ("Major Schaaf"), who was the Commander of the Security Police Squadron and Director of Personnel for the 190th Air Refueling Group. Ms. Fortner's first line supervisors included Master Sergeant Edward L. Holm ("Sergeant Holm"). The plaintiff was the only female SRPO at Forbes Field, but there was another woman who worked full-time with similar duties at Forbes. The position description for SRPO listed such hazards and risks as confrontation with persons denied entry, abusive language, criticism, confrontation with force, and the possible need to use deadly force.

In April of 1993, Major Schaaf called the plaintiff into his office and ordered her to put her hair up. He explained to her that by wearing her hair in a ponytail she was a security risk and was in violation of the regulatory prohibition of exaggerated hair styles.[1] When he called her into his office, Major Schaaf understood that the plaintiff recently started wearing her hair in a ponytail and that the plaintiff had not stopped wearing it in ponytail even though two sergeants had discussed it with her.[2]

---

[1]. On or about January 7, 1993, Major Schaaf issued a Security Policy Operations Instruction ("SPOI") on uniforms and appearance of all personnel of the 190th Security Police Flight, including SRPOs. The last section of SPOI 125–1, at page five, provides:

> (1) Male—Hair shall be evenly trimmed, tapered, or blocked, to the hairline on the sides and rear of the head. Hair will not cover any portion of the ear. Hair will not extend over the collar while standing in a normal posture, nor fall below the eyebrows when wearing the headgear....
>
> (2) Female—Hair styles will allow the wearing of proper headgear and will not be longer than shoulder length. Exaggerated styles with fullness in excess of five inches bulk are not appropriate. Pins, combs, or barrettes similar in color to the individuals hair may be worn. Hair nets, and ornaments such as ribbons may

not be worn. If hair pieces are worn they will conform to these same standards.

(Dk. 63, Ex. 2).

[2]. The plaintiff testified that she always had worn her hair in a ponytail and that she had told Major Schaaf that he was the first person to order her to wear her hair up. The case progress notes of the Kansas Human Rights Commission ("KHRC") field representative, Kathryn Sterling, who was assigned to investigate this administrative charge, show that the plaintiff told Sterling that she had been wearing her hair in a bun and then started wearing a ponytail. (Dk. 63, Ex. 13.) The plaintiff also told Sterling that Major Schaaf had explained that she could not wear a ponytail as it could be grabbed. *Id.*

On or about June 23, 1993, the plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC") alleging that she was the victim of discrimination on the basis of sex as she had been asked to wear her hair up while male SRPOs were not required to comply with the same Security Policy Operations Instruction ("SPOI") 125–1. The plaintiff testified that males were not told to cut their hair when it reached their collars or otherwise failed to comply with the SPOI 125–1. The plaintiff, however, also testified that none of the males wore a ponytail or had hair long enough to wear in a ponytail.

In June of 1993, the plaintiff and her husband, who also was a SRPO at Forbes Field, bought a house and moved, and this proved to be a difficult experience for the plaintiff. On June 10, 1993, the plaintiff called Master Sergeant John Wright and asked if her husband could have the day off to work around the house. Master Sergeant Wright advised the plaintiff that leave requests were to be made five days in advance, that she and her husband needed to discuss their priorities, that he would give her husband the day off, and that in the future Mr. Fortner should make his own requests for leave. After that telephone call, the plaintiff deliberately avoided Master Sergeant Wright, but she denied that workplace had become uncomfortable as a result.

In August of 1993, the plaintiff filed a complaint that a male co-worker, Harvey Harrison, had made comments that she should not lead the union because she was female. The plaintiff presented the complaint as a grievance to Major Schaaf who investigated her allegations. In a memorandum prepared after the event, Major Schaaf recounts that he spoke with Harrison who denied any sexist comments and ordered Harrison to cease any comments about the plaintiff's gender, that he spoke with the plaintiff who appeared quite upset and distressed by the situation, and that he wanted an "expert on EEO issues for state employees [to] become immediately involved in the resolution of this critically important issue."

(Dk. 59, Ex. C). In August of 1993, the plaintiff signed a memorandum saying that she was satisfied with the corrective action taken by Major Schaaf and that she would report any future incidents of discrimination to him. The plaintiff testified that Harrison committed no additional discriminatory acts.[3]

In October of 1993, the plaintiff visited a clinical social worker/marriage and family therapist, Bernard Nobo, in October and November of 1993. Nobo assessed that the plaintiff was overextended with National Guard, full-time employment, six hours of school, a part-time job, marriage, and two children. Nobo advised her to slow down.

On December 16, 1993, the plaintiff was working security at the main gate to Forbes Field. She called for relief, as there were no restroom facilities in the guardhouse. When relief arrived, the plaintiff took the van and accidentally backed into a parked truck. On January 10, 1994, Major Schaaf appointed Sergeant Mercer to investigate this vehicle accident and prepare a report of survey.

On January 11, 1994, the plaintiff was verbally counseled by Sergeant Holm for arriving late two consecutive days. She was five minutes late on January 10, 1994, and three minutes late on January 11, 1994.

The plaintiff's husband, David Fortner, daily brought the plaintiff's two children, who were four and five years of age at the time, onto the base and left them in the breakroom for anywhere from ten to fifteen minutes. The children were unattended in the breakroom while the plaintiff and her husband both attended the "guard mount" meeting. After the meeting, the plaintiff went off duty and took the children home with her. On January 13, 1994, David Fortner received a memorandum from Master Sergeant Wright stating:

> This letter is to inform you that starting 27 Jan 94 you will no longer be allowed to bring your dependent children to Forbes Field. You have been observed bringing your two dependent children and have them wait for your wife to be relieved from duty and then transport them home. Due

---

3. In December of 1993, Harrison was dismissed for, *inter alia*, "a pattern of tardiness" and "fail-ure to maintain a harmonious relationship with co-workers." (Dk. 59, Ex. D).

to the liability if your children should be injured when on Forbes Field this will not be allowed after 27 Jan. 94.

(Dk. 63, Ex. 1).[4] David Fortner testified that no other SRPOs regularly brought their children to the work place. He also testified, however, that he saw other employees regularly bring their children to the base and he knew of one officer who left his child unattended in the breakroom a couple of times.

Field representative Sterling with the KHRC began investigating the plaintiff's discrimination complaint concerning hair styles on January 10, 1994. The documents show that Sterling spoke with the plaintiff and two male SRPOs on January 10, 1994, and that Sterling did not interview Major Schaaf or Sergeant Wright until January 19, 1994.

On January 20, 1994, Sergeant Holm issued the plaintiff a memorandum that her uniform trousers were not in compliance with SPOI regulations. The memorandum specified a two-week grace period for the plaintiff to bring her trousers into compliance. The plaintiff does not dispute that her trousers violated the regulation.

Sometime during the first part of January of 1994, David Fortner became upset with his wife at work when he found a letter addressed to his wife from another man. David Fortner asked Major Schaaf to be present as he argued with his wife about the letter. From witnessing this event, Major Schaaf had some concerns about the Fortner's marriage.

On January 20, 1994, Major Schaaf called the plaintiff to his office and was upset with her for allowing a civilian airport authority ("MTAA") officer onto the base without checking the officer's identification. Major Schaaf was angry with her and slammed his hands on his desk. According to the plaintiff, the SRPOs had not been instructed to check the identification of these officers.

On January 21, 1994, Major Schaaf spoke with supervising officers of the civilian airport authority ("MTTA") and asked them to instruct their patrol officers to avoid extended visits at the main gate. Major Schaaf explained to them that some of his SRPOs were having domestic problems and that this policy might help the situation. Major Schaaf did identify the SRPO as Nancy Fortner and asked them to keep this information confidential. The plaintiff eventually heard that Major Schaaf had told the MTAA officers that she was having marital problems.

On January 24, 1994, Sergeant Mercer filed his investigative report recommending that the plaintiff be found not negligent in the car accident. The five reasons he gave for his conclusion included: (a) there were no restroom facilities at the main gate; (b) the plaintiff had not driven the van for a long time; (c) there was inadequate parking at the main gate; (d) the accident report was incomplete; and (e) there were no established procedures covering post changes and approved traffic flow at the main gate. (Dk. 63 at 16). Major Schaaf responded in writing to Sergeant Mercer's report saying he "completely disagreed" with it. (Dk. 63 at 17). Major Schaaf noted that Mercer's reasons for his conclusion were "irrelevant" to whether Ms. Fortner was negligent in backing the van into the parked truck. (Dk. 63 at 17).

Sergeant Holm wrote a letter of recommendation for the plaintiff on March 6, 1994. The letter, *inter alia,* praised the plaintiff for her "work ethic, her desire for self-improvement, and her dedication to duty." The plaintiff's "Quarterly Performance Feedback" for the first quarter of 1994 included a letter of accommodation praising her voluntary projects at the main gate. The form also reflected two consecutive tardies.

On March 22, 1994, the plaintiff filed a complaint with the KHRC and the Equal Employment Opportunity Commission ("EEOC") alleging that the following acts were taken in retaliation for her previous complaint charging discriminatory enforcement of hair style regulations: (a) Major Schaaf asking the plaintiff's supervisors to give statements regarding the plaintiff's hair; (b) Major Schaaf reprimanding the plaintiff

---

**4.** David Fortner's testimony that the plaintiff had received permission from Major Schaaf prior to January 13, 1994, is inadmissible hearsay.

for allowing an MTAA officer on the base; and (c) Major Schaaf telling MTAA supervisors that MTAA employees should not visit at the main gate because the plaintiff was having marriage problems.

On April 13, 1994, the plaintiff was ninety minutes late and was verbally counselled.

By letter dated April 22, 1994, the KHRC notified the Adjutant General's Office that it had found probable cause to credit the plaintiff's allegations in her first complaint concerning discriminatory enforcement of hair style regulations. The letter was addressed to Lt. Col. John R. Mettner, Jr., the legal advisor to the Adjutant General. Mettner informed Major Schaaf of the probable cause finding by letter dated April 28, 1994.

In a letter also dated April 28, 1994, Lt. Col. Mettner wrote the plaintiff providing her with a copy of the Report of Survey from the accident and reminding her of her right to respond with comments directed to the Adjutant General by May 16, 1994. The letter further stated that "there is a strong possibility that you may be held liable for the damages to the vehicle you struck on December 16, 1993." (Dk. 63, Ex. 20). The Chief of Staff with the Kansas Army National Guard, Colonel Ronald E. Winchell, notified the plaintiff by letter dated October 3, 1994, that she was "relieved from responsibility for the loss, damage, or destruction of the Government property listed on" the report of survey. (Dk. 63, Ex. 3). The letter from Col. Winchell offers no reasons for this finding.

By letter dated May 19, 1994, the plaintiff's attorney informed the KHRC and Lt. Col. Mettner that the plaintiff would not settle her first claim for the recommended amount and that she planned to proceed with a lawsuit once the right to sue letter was received. (Dk. 63, Ex. 21).

On May 23, 1994, Sergeant Holm verbally counseled the plaintiff for arriving late two consecutive days and for failing to notify Central Security Control of her delay thirty minutes before guardmount. The plaintiff signed the counseling form but wrote "Disagree" under her name. Sergeant Holm requested her to provide a written explanation of her disagreement by the end of the duty day, May 23, 1994. The plaintiff did not provide a written explanation, and Sergeant Holm then verbally counseled her on May 24, 1994, for not following instructions.

The plaintiff filed a grievance from Sergeant Holm's counseling of her for being late two consecutive days. The plaintiff argued that extenuating circumstances, a water leak and an ill child, were the causes for being late. After discussing the grievance with the plaintiff, Major Schaaf on June 7, 1994, upheld the grievance on a finding that the plaintiff had "experienced circumstances beyond her control."

The plaintiff filed a grievance from Sergeant Holm's counseling of her for failing to follow instructions or insubordination. The plaintiff argued that she was not provided a proper amount of time to prepare a written response as ordered. Major Schaaf upheld the grievance on June 7, 1994.

The plaintiff testified that following the letter of insubordination Sergeant Holm had stopped talking to her in the work place and that Major Schaaf already had stopped talking to her. The plaintiff does not controvert Sergeant Holm's observation that the plaintiff made it a habit to "keep things stirred up" at work by threatening lawsuits if anyone upset her and complaining almost on a daily basis.

On June 1, 1994, Sergeant Holm counseled the plaintiff for reporting late within ninety days of a verbal warning for tardiness. The plaintiff filed a grievance arguing the letter of counseling was invalid as it did not state the prior date of counseling or warning. Major Schaaf found that letter of counseling was a moot point, as the prior letter had been set aside during the grievance proceeding.

On June 19, 1994, the plaintiff again arrived late and was counseled. The plaintiff's employment history refers to the plaintiff's problem with tardiness as early as 1992 and the first part of 1993.

On June 28, 1994, the plaintiff discovered a "Playboy" magazine in the breakroom at work. The plaintiff's husband testified he saw the magazine there on that one occasion.

Also on June 28, 1994, the plaintiff yelled some profanities at Airman Harold Dobbe as he drove through the main gate. The plaintiff testified her comments were made in jest to a friend.[5] On June 29, 1994, Airman Dobbe filed a complaint about the language used by the plaintiff. The plaintiff later apologized to Airman Dobbe. On July 26, 1994, Major Schaaf verbally counseled the plaintiff about using abusive language, but he did not issue a letter of reprimand. Shortly thereafter, the plaintiff filed a grievance that she was offended by vulgar language at the work place and she demanded that all other employees be counselled for using foul language or that the letter of counselling be removed from her record. Major Schaaf responded on August 15, 1994, that the plaintiff was counselled because he had received a written complaint and that if the plaintiff provided written documentation of any other employee using abusive language then he or she would be subject to the same discipline.

The plaintiff filed a grievance based on this incident. At step four of the process, Colonel Ellingson found that the plaintiff's profanities were inappropriate but proceeded to grant the plaintiff's request in ordering that all security personnel would be counselled on using appropriate language and in directing that the letter of counseling be removed from the plaintiff's personnel file. Despite the relief given, the plaintiff appealed her grievance to the next level. The Adjutant General upheld Colonel Ellingson's ruling.

On or about September 13, the plaintiff filed another discrimination complaint with the KHRC and the EEOC alleging retaliatory conduct because supervisors had not talked with her, because her husband had been ordered not to bring the children to work to wait for her, because she had been verbally counselled for tardiness beyond her control, and because she had received a letter stating that she could be held liable for damages to a government vehicle. The complaint further charged that the plaintiff was subjected to harassment as an issue of "Playboy" magazine was left in open view.

Bonita Pardue–White works for the Adjutant General maintaining employee records.

She testified that she was not aware of another employee in that work force who had been disciplined in writing for using abusive language. Ms. Pardue–White opined that the documentation in plaintiff's employment file was more than most employees but similar to some other employees. Al Nauman, human resources director for state employees working for the Adjutant General, also opined that there had been difficulties with women working at Forbes Field and speculated that it was "a military problem."

The plaintiff began psychiatric treatment with Dr. Martinez–Mercado on August 18, 1994. On September 8, 1994, Dr. Martinez–Mercado wrote a note that due to severe distress the plaintiff would not be able to work for two weeks while she received intensive treatment. On September 22, 1994, Dr. Martinez–Mercado sent another note that the plaintiff was "not to return to Forbes Field job until she is medically fit to do so and released by me."

The plaintiff underwent an independent psychological examination pursuant to administrative regulations and the employment agreement with state employees. Dr. Herbert Modlin with the Menninger Clinic issued a report dated December 15, 1994, opining that the plaintiff should be able to return to work if she could "get a reasonable 'harassment-free' reassurance." (Dk. 59, Ex. F). Dr. Martinez–Mercado released the plaintiff to return to work on January 31, 1995.

Relying on Dr. Modlin's report, Major Fritz wrote the plaintiff on January 24, 1995, stating in part:

2. You are expected to return to your assigned duties on 7 February 1995 at 0645 hours.

3. You will be treated the same as any other satisfactory performing employee is treated.

(Dk. 59, Ex. G). Instead of returning to work, the plaintiff left the following letter with the Kansas Human Resources Office: "As of 7 March 1995, I feel I have been forced to resign from the position of State

---

5. The plaintiff's testimony as to what Airman Dobbe told her is inadmissible hearsay.

**1264**

Resources Protection Officer at Forbes Field." (Dk. 59, Ex. H).

## DISPARATE TREATMENT CLAIM

 On this claim, the plaintiff alleges in the pretrial order that Major Schaaf ordered her to wear her hair up in accordance with SPOI 125–1 while her male counterparts were not required to comply with the same regulation. Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.'" *United States Postal Service v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citation omitted). "Title VII is not violated by the exercise of erroneous or even illogical business judgment;" thus, it is not a vehicle for second-guessing the employer's business judgment absent evidence of a discriminatory motive. *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir.1993).

Although direct or indirect evidence may be used to prove employment discrimination, in practice, plaintiffs typically offer only circumstantial proof because "there is rarely direct evidence of discrimination." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994). Since the plaintiff offers no direct evidence, she must rely on circumstantial evidence. The court applies the burden shifting procedures set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to evaluate whether the plaintiff can prove the defendant's discriminatory intent circumstantially. *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1533 (10th Cir.1995).

 To survive summary judgment on her claim, the plaintiff first must establish a prima facie case that the employer engaged in the alleged discriminatory practice. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). A rebuttable pre-

sumption of discriminatory intent arises from proof of a prima facie case. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Sorensen v. City of Aurora*, 984 F.2d 349, 352 (10th Cir.1993).

 If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant who can rebut the presumption by articulating a legitimate, facially nondiscriminatory reason for the adverse employment action being challenged. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Randle*, 69 F.3d at 451. "[T]he defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (citations omitted). The employer's reason for the adverse action, however, "must be reasonably specific and clear." *Id.*

 If the defendant employer makes this showing, the presumption of discrimination created by the prima facie case "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see Ingels v. Thiokol Corp.*, 42 F.3d at 621. "'At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief.'" *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 327 (10th Cir. 1996) (quoting *Randle v. City of Aurora*, 69 F.3d at 451), *petition for cert. denied*, — U.S. ——, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996). A plaintiff may demonstrate pretext by proving either "'that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.'" *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir.1994) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). "If no facts relating to the pretextuality of the defendant's action remain in dispute, sum-

mary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 798 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995). "[T]he Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" *St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. at 2749 (citation omitted).

■ A prima facie case of disparate treatment gender discrimination here requires the plaintiff to prove: (1) she belonged to the protected class; (2) she was adversely affected by the employer's action; (3) she was qualified for the position; and (4) defendant treated her less favorably than male employees in the same or similar circumstances. *Sharon v. Yellow Freight System, Inc.,* 872 F.Supp. 839, 846 (D.Kan.1994); *see Cole v. Ruidoso Mun. Schools,* 43 F.3d 1373, 1380 (10th Cir.1994); *Henry v. Gehl Corp.,* 867 F.Supp. 960, 963–964 (D.Kan.1994). The plaintiff submits evidence that Major Schaaf required the plaintiff to wear her hair in compliance with SPOI 125–1 while some male SRPOs wore their hair in violation of the same regulation and were not ordered to comply. When the evidence is characterized in this general fashion, it seems sufficient to create a prima facie case. A closer look at the evidence shows the male employees were allowed to wear their hair in violation of SPOI 125–1 under circumstances that arguably are distinct from the plaintiff.

The plaintiff presents evidence that certain male SRPOs wore hair longer than allowed by regulation. None of the male SRPOs, however, wore their hair in ponytails or had hair long enough to wear in ponytails. When he ordered the plaintiff to wear her hair up, Major Schaaf explained that wearing hair in a ponytail posed a security risk. It seems a simple matter of commonsense if the plaintiff were exposed to physical force that her adversary probably would recognize the ponytail as a conspicuous way to gain significant leverage over her. The plaintiff offers no evidence to show that the male SRPOs' longer hair posed the same or similar security risk as the ponytail worn by the plaintiff. For this reason, the court is not satisfied that the plaintiff can make a prima facie case

without showing that the male SRPOs wearing hair in violation of SPOI 125–1 posed the same or similar security risk. *See McAlester v. United Air Lines, Inc.,* 851 F.2d 1249, 1261 (10th Cir.1988) (for the evidence to be sufficient the other employees must engage in acts of comparable seriousness).

■ Even if it were to accept the plaintiff's evidence as a prima facie case of discrimination, the court finds that the plaintiff's proof does not demonstrate pretext. Major Schaaf's security concern with the plaintiff's ponytail is clear, legitimate, and nondiscriminatory. The plaintiff does not offer evidence from which a jury could reasonably find that Major Schaaf was more likely motivated by the plaintiff's gender or that Major Schaaf's reason is unworthy of belief. There is no evidence that this is a case where Major Schaaf consistently and strictly enforced SPOI 125–1 or related regulations against the female employees but not the male employees. The plaintiff presents no evidence that Major Schaaf had made sexist comments, had ignored complaints of sexual discrimination or harassment, had otherwise tolerated such discrimination, had discriminated against the plaintiff on prior occasions, or had discriminated against other female employees. The record is further devoid of evidence that Major Schaaf's security concern was so unfounded or insubstantial as to suggest that a discriminatory motive was at work. The plaintiff's perception over the fairness of not being able to wear a ponytail does not matter. "It is the perception of the decision maker which is relevant, not plaintiff's perception of herself." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988) (citation omitted). The plaintiff's mere conjecture that Major Schaaf's security reason was a pretext for sex discrimination will not stave off summary judgment. *Branson,* 853 F.2d at 772. Finally, the testimony of Al Nauman likening Forbes Field to the Citadel is not a reasonable basis for inferring a discriminatory motive behind every action taken against a female employee. As for the conclusory opinion of Ms. Pardue–White, assuming its admissibility, it does not show that the plaintiff was treated differently by reason of her gender. In short, the defen-

dant is entitled to summary judgment on the plaintiff's disparate treatment claim.

## RETALIATION CLAIM

■ With respect to this claim, the plaintiff alleges in the pretrial order that:

As a result of plaintiff filing charges with the Kansas Human Rights Commission and Equal Employment Opportunity Commission, defendant repeatedly retaliated against plaintiff by creating an extremely hostile work environment for the plaintiff in repeatedly exercising its discretion adversely to her and unfairly disciplining her contrary to accepted practices.

(Dk. 41 at 3). Section 2000e–3(a) of Title VII provides in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ..., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter.

The general *McDonnell Douglas* burden-shifting approach used in Title VII discrimination suits also operates in Title VII retaliation suits. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996); *Sorensen,* 984 F.2d at 353.

■ To establish a prima facie case of retaliation, the plaintiff must show: (1) she engaged in protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the defendant employer subsequent to or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Berry,* 74 F.3d at 985; *Griffith v. State of Colo., Div. of Youth Services,* 17 F.3d 1323, 1331 (10th Cir.1994). The plaintiff's opposition is protected even if the plaintiff was not successful in prosecuting her original discrimination charge, *Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 487 (10th Cir.1991), and even if the defendant's practice did "not actually violate Title VII," *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994). It is enough that the plaintiff had a reasonable good faith be-

lief that the employer discriminated. *Dey,* 28 F.3d at 1457; *Plakio v. Congregational Home, Inc.,* 902 F.Supp. 1383, 1392 (D.Kan. 1995). The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Burrus v. United Telephone Co.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). While at the same time rejecting efforts to expand the required temporal proximity, the Tenth Circuit will not apply this requirement "too restrictively where the pattern of retaliatory conduct begins soon after the filing of the ... complaint." *Marx v. Schnuck Markets, Inc.,* 76 F.3d at 329.

The plaintiff insists that the defendant repeatedly took adverse actions against her and her husband on the heels of her filing of the discrimination complaint and the KHRC's investigation of it. The defendant argues that much or all of what the plaintiff complains about does not amount to adverse employment actions. The plaintiff does not answer this particular argument and cites nothing to support her broad interpretation of this element.

■ What the plaintiff considers adverse action is far more than what the courts have recognized. It is true that courts generally give a liberal definition to "adverse employment action." *See Berry,* 74 F.3d at 986. "Title VII does not limit adverse job action to strictly monetary considerations." *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987). Examples of adverse employment actions include decisions that have a demonstrable adverse impact on future employment opportunities or performances, *See Berry,* 74 F.3d at 986, demotions, adverse or unjustified evaluations and reports, *id.; McKenzie v. Atlantic Richfield Co.,* 906 F.Supp. 572, 575 (D.Colo.1995); transfer or reassignment of duties, *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127–28 (10th Cir.1993); failure to promote, *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 (10th Cir.1992); and unfavorable letters of reference to prospective employers, *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1164–65 (10th Cir.1977).

Common to these cases is that the alleged retaliatory act affected the terms and conditions of employment. *See Boyd v. Brookstone Corp. of New Hampshire, Inc.,* 857 F.Supp. 1568, 1572–73 (S.D.Fla.1994).

▮ An employer's words or decision is not an adverse employment action just because the employee dislikes it or disagrees with it. Examples of where an employer's words or decision did not amount to an adverse employment action include: supervisors gave the plaintiff a performance review that was lower than previous reviews but still within the range of satisfactory, *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994); "mere criticism and counseling alone do not constitute 'adverse action,'" *Simmerman v. Hardee's Food Systems, Inc.,* No. 94–6906, 1996 WL 131948, at *14 (E.D.Pa. Mar. 22, 1996); fellow employees treated plaintiff "almost contemptuously" and subjected her to "isolation treatment," and the plaintiff's work performance was publicly criticized; *Beaver v. Prudential Ins. Co. of America,* No. 94–4181–DES, 1996 WL 109547, at *5 (D.Kan. Feb. 1, 1996); a non-threatening reprimand letter was placed in the plaintiff's personnel file but later removed, *See Fowler v. Sunrise Carpet Industries, Inc.,* 911 F.Supp. 1560, 1583 (N.D.Ga. 1996); employer took various actions that did not adversely impact the plaintiff's job performance or standing, *Ballou v. University of Kansas Medical Center,* No. 93–2524–GTV, 1995 WL 261981, at *6 (D.Kan. Apr. 7, 1995); the plaintiff was issued a formal warning that was eventually removed from the personnel file, *Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822, 836 (D.Md.1994), *aff'd,* 77 F.3d 745 (4th Cir.1996); the plaintiff received an adverse evaluation and letter of reprimand that were later rescinded; *Raley v. Board of St. Mary's County Com'rs,* 752 F.Supp. 1272, 1278, 1281 (D.Md.1990); a letter of reprimand placed in the plaintiff's file is too speculative to assume it could have future repercussions, *Rivers v. Baltimore*

*Dept. of Recreation,* No. R–87–3315, 1990 WL 112429 (D.Md. Jan. 9, 1990). These cases stand for the proposition that "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions ... of Title VII." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

▮ Based on the above precedent, the court concludes that the plaintiff has not come forth with proof that she suffered any "adverse employment action" following or contemporaneous with her filing of the discrimination charge. From Major Schaaf's appointment of Sergeant Mercer to investigate the plaintiff's vehicle accident at work, to Major Schaaf's verbal reprimand for not checking a MTAA officer's identification, to Lt. Colonel Mettner's letter that the plaintiff may be held liable for damages arising from her vehicle accident, to Sergeant Holm's different letters of counselling that were later removed, and finally to Major Schaaf's memorandum of verbal counseling for abusive language, none of these actions nor any of the alleged intervening actions constitutes an adverse employment action. There is no evidence of record showing that any of these actions affected the terms or conditions of her employment. The plaintiff has not shown that these actions affected her authority, her standing, her rate of pay, her performance evaluations, her ability to perform, or her chances for promotion. For the most part, the alleged actions are nothing more than mediate decisions by an employer which are far too ephemeral in nature and effect as to be considered adverse employment actions.

Even if the court were to find a prima facie case of retaliation, the plaintiff has not presented evidence from which a reasonable jury could find that the defendant's reasons for the different actions are pretextual.[6] The

---

6. The plaintiff believes there are several bases on which the jury could find that the defendant's proffered reasons are unworthy of belief. The court concludes that the argued bases, individually or together, could not reasonably sustain a finding of pretext. Major Schaaf's objections to

Sergeant Mercer's report were entirely justified considering the untenable points made by Sergeant Mercer. The letters of counselling written by Sergeant Holm in May of 1994 do not evidence pretext, as Major Schaaf overturned each of them. He did so on discretionary or proce-

plaintiff does not dispute the factual basis on which the defendant relied in taking any of the actions. The record is likewise silent as to any meaningful disparities in the defendant's actions that would be consistent with a retaliatory motive. The plaintiff does not submit any evidence that other SRPOs came to work late under similar circumstances and did not receive verbal counseling. The plaintiff's employment records document a problem with tardiness prior to her filing of the discrimination charge. The plaintiff offers no evidence that other employees daily left their children unattended in the breakroom. Nor does she offer any evidence that other officers wore trousers that violated the SPOI and were not required to change.

■ The plaintiff has not demonstrated that the frequency and nature of the supervisors' criticisms changed significantly after the plaintiff filed her discrimination complaint. As for the general manner in which the plaintiff's supervisors avoided her or acted formally towards her " 'can be attributed to an increase of predictable tension in office after a discrimination charge is filed. This is not adverse employment action.' " *Hopkins*, 871 F.Supp. at 836 (quoting *Raley v. Board of St. Mary's County Comm'rs*, 752 F.Supp. at 1281 (citing *Geisler v. Folsom*, 735 F.2d 991, 994 (6th Cir.1984))). It is also uncontroverted that the plaintiff's habit of threatening lawsuits at work if anyone upset her and complaining daily was necessarily a contributing cause to tension in the work atmosphere. The court grants summary judgment on the plaintiff's retaliation claim.

**SEXUAL HARASSMENT—HOSTILE WORK ENVIRONMENT**

■ As to this claim, the plaintiff alleges in the pretrial order:

> dural grounds without giving any indication that the letters were insubstantial, unreasonable or factually unsupported. There is no evidence that any other employees daily brought their children on the base and left them unattended for some period of time. Nor is there evidence that other SRPOs were not verbally reprimanded for failing to check the identifications of MTAA officers. Major Schaaf verbally counselled the plaintiff for abusive language only because Airman Dobbe

The plaintiff has been subject to sexual harassment by the defendant through sexually explicit material being left in the designated area for break times and by the use of offensive language directed at her in a rude and hostile manner by a male superior.

(Dk. 41 at 3). Of the two principal theories of sexual harassment recognized under Title VII, the one alleged here is hostile work environment. For harassment to be actionable under Title VII, it must alter the conditions of employment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986).

■ "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–05). The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Id.* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 301. A "mere utterance of an ... epithet which engenders offensive feelings in a employee," *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405, does not impact a condition of employment and, therefore, does not implicate Title VII. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.*

■ To recover on this claim, the plaintiff must prove the work environment would reasonably be perceived, and was per-

> filed a written complaint about the plaintiff's language. Ms. Pardue-White's testimony that she was not aware of another employee at Forbes Field who had been disciplined in writing for using abusive language is insufficient to show pretext, because she was not asked whether she also knew of another employee at Forbes Field who had been the subject of an abusive language complaint.

ceived by her, as hostile or abusive. *Id.* The Supreme Court put it this way:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation.

510 U.S. at 21–22, 114 S.Ct. at 370, 126 L.Ed.2d at 302. In short, a hostile work environment claim includes elements of both subjective and objective harm to the employee. *Spain v. Gallegos,* 26 F.3d 439, 447 (3rd Cir.1994).

When is a work environment "hostile" or "abusive" is a case-by-case determination guided by no sharply defined rules. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. Circumstances to consider in each case include:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03. An environment that is discriminatorily abusive "often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris,* 510 U.S. at 22, 114 S.Ct. at 371, 126 L.Ed.2d at 302. These tangible effects are not a precondition to Title VII liability; it is enough to prove the harassing conduct was so severe or pervasive as to create an abusive work environment.

The elements to a hostile-environment sexual-harassment prima facie case are: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the alleged harassment was sufficient to affect a term or condition of employment; and (5) the employer either actively engaged in the harassment or is in some position on which liability can be imputed. *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1539 (D.Kan.1995); *Plakio v. Congregational Home, Inc.,* 902 F.Supp. at 1389 (and cases cited in each).

The plaintiff's evidence falls far short of showing an actionable claim of hostile work environment. Finding a Playboy magazine one time in the breakroom [7] is an isolated incident which the plaintiff has not shown to be related to any other alleged acts of harassment. *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Wright v. State Farm Mut. Auto. Ins. Co.,* 911 F.Supp. 1364, 1374 (D.Kan. 1995). Rather than an instrument with which to "purge the workplace of vulgarity," Title VII was designed more to "protect working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 430 (7th Cir.1995). The plaintiff offers no evidence to support her allegation in the pretrial order that a male superior directed offensive language at her in a rude and hostile manner as judged in the context of the military environment. *See Gross v. Burggraf Const. Co.,* 53 F.3d 1531, 1537–38 (10th Cir.1995). It is uncontroverted that profanity and cussing are part of the daily life in the military and Forbes Field. The plaintiff does not dispute that she contributed to the profanity at the workplace. As judged by a military environment, the plaintiff utterly fails to show she suffered a "steady barrage of opprobrious" sexual comments. *Gross,* 53 F.3d at 1539. The plaintiff erroneously seeks to incorporate her evidence of retaliatory acts in proving a hostile

---

7. The plaintiff offers no evidence that she had seen "Playboy" magazines at work on other occasions. Nor does she offer any factual circumstances from which one can infer that someone intentionally left the magazine hoping the plaintiff would see it.

.work environment. " 'If the nature of an employee's environment, however, unpleasant, is *not due to her gender,* she has *not* been the victim of sex discrimination as a result of that environment.' " *Gross,* 53 F.3d at 1537 (quoting *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994)); *see Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996). "General harassment if not racial or sexual is not actionable." *Bolden,* 43 F.3d at 551. It is quite clear that the plaintiff was unhappy with the workplace, but her evidence fails to demonstrate that the conditions under which she worked were such that a reasonable person would find them permeated with sexual comments, intimidation, ridicule, and insult by reason of the plaintiff's gender. Unsupported by the necessary proof, the plaintiff's hostile work environment claim is subject to summary judgment.

## CONSTRUCTIVE DISCHARGE

■ To prove a prima facie case of constructive discharge, the plaintiff must demonstrate that the defendant subjected her to working conditions that a reasonable person would view as intolerable while other employees outside the protected group were not similarly treated. *Reynolds v. School Dist. No. 1, Denver, Colo.,* 69 F.3d at 1534. The plaintiff must further show that a reasonable person would consider the conditions so intolerable as to feel compelled to resign or quit. *Id.; Bolden v. PRC Inc.,* 43 F.3d at 552. The plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich v. K– Mart Corp.,* 858 F.Supp. 1087, 1093 (D.Kan. 1994), *aff'd,* 70 F.3d 1282 (10th Cir.1995) (Table).

The court finds no evidentiary basis from which a jury could reasonably find that a reasonable person in the plaintiff's position would consider the working conditions so intolerable as to quit. Besides lacking evidence that any of the actions taken against her were due to illegal discriminatory motives, the plaintiff simply does not come forth with proof that her psychological reaction to the workplace was reasonable under the circumstances. The defendant is entitled to summary judgment on the constructive discharge claim.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 59) is granted.