Ed M. SHARON, Plaintiff,

v.

YELLOW FREIGHT SYSTEM, INC., Defendant.

No. 94–2035–KHV.

United States District Court, D. Kansas.

Nov. 7, 1994.

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, James E. Kunce, Overland Park, KS, for plaintiff Ed M. Sharon.

Robert W. McKinley, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, for defendants Yellow Freight System Inc. of Delaware, a Del. Corp., Yellow Technology Services, Inc., a Del. Corp.

Robert W. McKinley, Tedrick Addison Housh, III, Swanson, Midgley, Gangwere,

Kitchin & McLarney, LLC, Kansas City, MO, for defendant Yellow Freight System, Inc., an Ind. Corp.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Defendant Yellow Freight System, Inc.'s Motion for Summary Judgment* (Doc. # 38). Plaintiff Ed M. Sharon claims that defendant Yellow Freight Systems, Inc. ("YFS") unlawfully discriminated in the terms and conditions and termination of his employment on the basis of religion, national origin, gender, and age, in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). Plaintiff also claims breach of express and implied employment contract and/or promissory estoppel. Defendant seeks summary judgment on the grounds that plaintiff cannot establish a prima facie case of employment discrimination or show that defendant's justification for his discharge is pretextual. Defendant further asserts that, as a matter of law, plaintiff cannot establish breach of contract or promissory estoppel.

 Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court considers all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party, however, "may not rest upon its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those matters for which it carries the burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

## A. FACTS

The following facts are either undisputed or construed in the light most favorable to plaintiff.

Plaintiff is an Israeli male who practices the Jewish faith. At all relevant times he was over 40 years old. In December, 1990, he contacted YFS to explore the possibility of a full-time employment position to develop systems similar to the ones he had formerly proposed to YFS. At the time he contacted YFS, plaintiff was operating an independent consulting business in New Jersey. He possessed four advanced degrees (B.S., M.S., MBA & Ph.D.) and had 15 years of experience in transportation and research. YFS was familiar with plaintiff's work before he inquired about employment.

In late January or early February, 1991, Mike Bunch, a technical recruiter for YFS, telephoned plaintiff. He stated that YFS was impressed with plaintiff's background and wanted to discuss an employment position paying a salary in the mid $50,000 range, less than plaintiff had earned as an independent consultant. YFS personnel subsequently arranged for an interview in mid-February. Prior to the interview, plaintiff completed and signed an employment application, which he brought with him to the interview. On the application, plaintiff stated that he desired full-time employment with YFS in information research.

During the interview, plaintiff met with supervisors of the position Joyce Drummond and Cathy Larrimer, Mike Bunch, and the personnel office. Bunch discussed a career job, one with a starting date with no ending date. Larrimer met with plaintiff for three hours. They discussed a position in the information technology research task force and the purpose/mission of the group. Plaintiff met or exceeded all background requirements for the position. Larrimer represented that the position would be long-term and stable, and that if plaintiff did a good job he could continue to work there for as long as he wished. Larrimer recognized that plaintiff had qualifications, including computer modeling and simulations, industrial engineering, and operations research, which no

other member of her department possessed. During the interview, Larrimer was aware of plaintiff's age, national origin, religion, and sex.

Larrimer recommended that YFS hire plaintiff. She believed plaintiff would generate an interest in new projects for the department, reduce backlog, improve the standing or prestige of department, and open an avenue to gain new internal clients. Drummond and Bob Callaghan, the department head over Drummond and Larrimer, approved the recommendation. When YFS recruits an out-of-state candidate, it expects that the position will be permanent and that as long as the employee performs satisfactorily he or she will stay with the company for some period of time, as long as conditions remain favorable. Callaghan, an officer of YFS, understood that YFS would retain a permanent employee as long as conditions warrant. Drummond considered the position offered to plaintiff to be a career position.

A few days after the interview, Larrimer called plaintiff and offered him a full-time, career position as an information technologist research specialist. She stated that YFS was impressed with plaintiff's background and that he would make a nice addition to the group. Plaintiff requested an offer in writing. He believed that the short response time between the interview and offer indicated that YFS was strongly interested in him. While contemplating the YFS offer, plaintiff turned down an opportunity with a pharmaceutical company in his area on the basis that YFS was willing to commit to a long-term career opportunity. He also ceased pursuing an opportunity with the Long Island R.R., where he had progressed through three interview stages.

On February 18, 1991, Bunch wrote to plaintiff, formally extending an employment offer. Before accepting, plaintiff conferred with Bunch and Larrimer concerning his benefit package including relocation expense, temporary living expense, medical benefits, and vacation. On March 19, 1991, Bunch sent plaintiff a letter addressing plaintiff's questions about the benefit package. Plaintiff accepted the offer. On March 20, 1991, Bunch wrote to plaintiff confirming the terms

of employment and a starting date of April 1, 1991. The letter did not recite all the agreements and representations which YFS made in the interview process and subsequent correspondence. Plaintiff read the letter carefully and did not question why additional terms of employment were not in the letter.

At the time plaintiff accepted the offer, his wife had a professorship with Rutgers University in New Jersey. She continued to reside there with their three children until August, 1991, when she and the children relocated to Kansas.

When plaintiff began working for YFS, he learned YFS policies and procedures through various orientation materials and programs. YFS characterizes its communication policy as one of freedom and openness, removal of organizational boundaries, and exchange of ideas. YFS indoctrinated plaintiff to its adherence to Total Quality Management, a program which emphasizes continuous quality improvement through employee communication and participation. YFS policies require the identification of performance problems and corrective action be specific, *i.e.* objective rather than subjective. YFS managers apply a progressive discipline policy. If coaching resolves an issue, it no longer justifies further employee action.

On June 24, 1991, plaintiff's supervisor Larrimer met with plaintiff to discuss problems with his performance. She told him that customers (users of the services at YFS) felt that he did not know how YFS worked, that he did not listen to them, that he was trying to take over some things, and that he sometimes conveyed the impression that he thought YFS did not know the trucking business. After sharing these comments, Larrimer supported plaintiff's actions and recommendations regarding ongoing projects.

Following the counselling sessions in June, 1991, plaintiff had several frank discussions with Larrimer wherein he informed her of his family's situation and expressed concern whether he and YFS were a good match. Larrimer assured him that he was in the right place at the right time, that YFS would encourage employee initiative and creativity, that she would expect plaintiff to communi-

cate across boundaries between organizations, that plaintiff was to champion ideas and concepts with persistence, that YFS would accommodate plaintiff's relocation, that she was aware of plaintiff's background differences, that YFS strongly needed plaintiff, and that she deliberately hired plaintiff in order to diversify, broaden, and deepen the skills of the research group.

Larrimer asserts that she maintained a running commentary on her computer detailing favorable and negative incidents concerning all employees she supervised. Plaintiff claims that Larrimer kept a log on him only, and not the other employees. He points to the fact that none of his co-employees' personnel files contain any such log.[1] Larrimer stated that the reason she kept the log on plaintiff was in case something like this lawsuit occurred. She feared that plaintiff would file an EEOC complaint and lawsuit following his termination.

On August 6, 1991, Larrimer counseled plaintiff that he needed to be more diligent in notifying management when he would not be at work. The incident arose out of plaintiff arriving late to work, without notifying Larrimer in advance, because household movers from New Jersey had delayed him.

In mid to late August, 1991, Larrimer counseled plaintiff about his wording in a memorandum. She felt that the wording chosen by plaintiff reflected an attitude problem, or lack of respect.

On September 11, 1991, Larrimer met with plaintiff and set goals for punctuality and a neat working area. Larrimer noted in her log that plaintiff arrived late several times during the next two weeks; however, she did not speak to him about it. On September 20, 1991, plaintiff asked to change his work hours so that he could arrive and leave a half an hour later. Larrimer approved the request and viewed it as a positive step.

In mid-September, 1991, Larrimer counseled plaintiff for distributing a revised memorandum without her final approval. Larrimer required that all information technology research employees in her department submit all documents for her approval before they left the department. This requirement was not in writing, and Larrimer did not necessarily apply it to correspondence between members of quality circles. The requirement was not enforced company-wide, although Drummond testified that she requires the same from her employees.

Plaintiff did not learn of Larrimer's distribution requirement when he first started working at YFS; however, Larrimer discussed the requirement with him once or twice before December, 1991. After learning of the requirement, plaintiff followed it most of the time (except the for a few incidents which he believed were minor and benign), even though he believed that the requirement was discriminatory, unjust, and contrary to YFS company policy. Plaintiff does not know whether Larrimer required the other employees in her department to submit written materials for her approval before sending them outside the department.

On September 18, 1991 (Yom Kipper) Larrimer wrote in her log that she suspected that plaintiff's calling in sick that day was an abuse of time off. The week before, plaintiff had asked for a few hours off on Monday and Tuesday to attend Rosh Hashana services. Larrimer told him that he had taken excessive time off already. After consulting employee benefits, she learned that YFS honored religious holidays and that she should inform plaintiff that he could take the time off, but that he should plan to use his floating holidays for such purposes in the future. When plaintiff called in sick a week later, Larrimer noted that it was Yom Kipper and that she suspected that plaintiff was abusing the time off from work.

YFS had assured plaintiff that he would be able to negotiate personal time off without pay for relocation, observation of religious holidays, and additional vacation as a precondition of employment. The record does not

---

1. Plaintiff also points to Larrimer's deposition testimony, which he contends supports that Larrimer maintained the file on him alone. A careful reading of her testimony, however, reveals that she stated that prior to the deposition she had reviewed only plaintiff's file and not that of any other employee.

indicate, however, that plaintiff attempted to negotiate for time off without pay.

In October, 1991, Larrimer noticed that plaintiff arrived a half an hour late on one day and left a half an hour early on the next day. On October 24, 1991, Larrimer contacted human resources and prepared a Notice of Corrective Action form stating that plaintiff was not complying with expectations to be punctual and present for work. She did not issue it, however, because Drummond recommended that she do more coaching. Although the supervisor's log contains entries that Larrimer observed plaintiff arriving late on subsequent occasions, it contains no entries that she coached him on this subject.

On December 6, 1991, plaintiff received a Notification of Corrective Action appraised by Larrimer and reviewed by Drummond. The notice placed plaintiff on a 90-day probationary period and threatened further discipline, including termination, should plaintiff not perform at an acceptable level during that time period. The notice stated that plaintiff had performance problems in the following areas: (1) punctuality, being present at work, and notifying management before any deviation from normal working hours; (2) adhering to the clean desk policy; (3) following instruction, continuing to work on projects that have been prohibited by management, and ignoring requests by management; and (4) ignoring messages from users that they do not wish to work on those areas over which they have no responsibility or control. The notice required the following corrective action: (1) suspension of flex-time hours, punctual attendance from 8:00 a.m. to 5:00 p.m., written reports on all meeting schedules and account for any time away from work area; (2) clean desk and maintain it in accordance with the clean desk policy; (3) follow managers' directions, including turning in time sheets and monthly status reports on time; (4) stop working on the S4 system; and (5) obtain manager approval, "in concept, for all project work, including memo writing, before it begins." This last requirement did not apply to oral communication.

Although YFS policy implements progressive discipline with the aim of rehabilitating the employee, Larrimer wanted to terminate plaintiff on the first business day following the Notice of Corrective Action because he requested that she review documents which he had given her almost a month earlier. Callaghan advised her that this was a weak reason for termination.

Following his placement on probation, plaintiff fully complied the requirement that he turn in timely schedules and cease work on the S4 system. Although YFS retained all of plaintiff's schedules, it has no record of schedules of any other research specialist who was supervised by Larrimer during the same time period.

On December 7, 1991, plaintiff came into the office on Saturday and cleaned his work area. He began recording other employees' work areas. His record reflects that on average his work area was no better or worse than others, and that some others' work areas were worse than his. During the time YFS employed plaintiff, YFS did not put any other employees on probation or discharge them for violating the clean desk policy.

By the end of December, 1991, plaintiff had made up all of his personal time off. After YFS issued the Notice of Corrective Action, he complied completely with the requirements that he be punctual and present at work. Prior to the probation period, plaintiff believes that his punctuality was no better or no worse than any other YFS employee. Plaintiff believes that other employees under Larrimer were equally late. YFS did not put any other employee on probation or terminated any other employee as a result thereof.

On December 11, 1991, Mr. Powell, president of YFS wrote a letter personally addressed to plaintiff directing him and all fellow employees to develop and implement strategies to improve individual account profitability and develop new business. He requested that they examine the way YFS did business and continue to ask if there was a better, more efficient way. He encouraged each employee to be creative, challenge existing paradigms, and use TQM to eliminate waste and rework.

In February, 1992, Larrimer met with plaintiff. She was angry because plaintiff had sent a draft of a document outside the department to Mike Champion and Owen Geisz without her approval. Plaintiff believed that Larrimer had approved a quality circle between him, Champion, and Geisz and, therefore, that he did not need her approval before sending documents to them. After finding out about the correspondence, Larrimer contacted her supervisor about firing plaintiff.

YFS policy requires that the Employee Review Committee ("ERC") review a proposed termination before it occurs. YFS contends that on February 19, 1992, the ERC met and concluded that YFS should terminate plaintiff's employment and that following the meeting, YFS discharged plaintiff. Plaintiff, however, disputes that the meeting took place before YFS terminated him, or that the ERC even met at all concerning the initial decision to terminate his employment. Under YFS policy, the supervisor proposing the discharge must present the case to the ERC. Larrimer has no recollection of any details of the meeting, including when the meeting occurred, what materials she presented, what materials others presented, Callaghan's comments, her comments, or how long the meeting lasted.

Plaintiff was not told the reason for his discharge. According to Drummond, plaintiff's major violation was continuing to work on the project with Geisz and Champion when their manager Jim Romick had specifically requested that information research not proceed any further on the project. Plaintiff claims that he did not know of this order and further disputes whether it was ever made.

YFS policy provides that an employee may appeal the ERC's decision within three days following his or her discharge from employment. Plaintiff was aware of this appeal right but chose not to exercise it. On April 15, 1992, plaintiff wrote to David Loeffler, YFS senior vice president, complaining of his discharge. YFS treated the letter as an appeal of the ERC termination decision. On April 30, 1992, the ERC met and reviewed the decision. Plaintiff gave a telephone presentation to the committee. The ERC affirmed the termination decision, concluding that plaintiff's overall performance, including failure to follow his supervisor's instructions, was unsatisfactory.[2]

During the time YFS employed plaintiff, YFS did not place any of its 1600 employees in the Kansas City office on probation or terminate their employment for any of the reasons that Larrimer cited in support of plaintiff's probation and/or termination, i.e. failure to be present at work, tardiness, early departure, violation of the clean desk policy, abuse of personal time off, abuse of flex-time policies, sleeping on the job, failing to turn off computers, and communicating outside the department without prior approval. The record does not indicate how many employees, if any, YFS coached or counseled for such actions. Plaintiff points to no specific employee who committed some or all of these offenses, or the equivalent thereof, whom YFS treated differently.

The information technology research department had six employees other than plaintiff. None had a national origin other than American or required accommodation for religious holidays (other than nationally recognized Christian holidays). One employee was female, and one was over forty years old.

On July 14, 1992, plaintiff filed an affidavit with the Equal Employment Opportunity Commission ("EEOC") complaining of, among other things, religious discrimination by YFS. In June, 1993, the EEOC investigator advised plaintiff that he could not file a discrimination charge on the basis of religious discrimination because he did not request religious accommodation. Based in

---

**2.** The minutes from the ERC meeting contain the following sentence: "[Plaintiff's] discharge was motivated by national origin, age and religion." Read in context, this sentence clearly describes the writer's interpretation of plaintiff's claims. Plaintiff, however, denies that he told the ERC that he felt that his termination was discriminatory on those grounds. The parties agree that a fact issue exists as to when the minutes were prepared, i.e. whether the minutes were prepared contemporaneously with the ERC meeting, and whether they accurately reflect what occurred at the meeting. Plaintiff does not contend that the sentence constitutes any admission by YFS that plaintiff's discharge was in fact motivated by those reasons.

this recommendation, plaintiff withdrew his charge of religious discrimination.

After his termination, plaintiff incurred expenses in the amount of $26,308.12 for job search and household expenses in relocating to his new residence in Haifa, Israel.

## B. DISCUSSION

### 1. *Religious Discrimination*

■ Defendant asserts that it is entitled to summary judgment on plaintiff's claim of religious discrimination because plaintiff voluntarily withdrew that claim from the EEOC investigation and, therefore, failed to exhaust his administrative remedies. Plaintiff contends that the claim is reasonably related to his claim of nation origin discrimination, and that defendant will not be prejudiced if the Court allows the claim. Plaintiff further points out that he withdrew the claim upon the advice of an EEOC investigator.

" '[E]xhaustion of administrative remedies is a jurisdictional prerequisite' to instituting a Title VII action in federal court." *Khader v. Aspin,* 1 F.3d 968, 970 (10th Cir.1993) (quoting *Johnson v. Orr,* 747 F.2d 1352, 1356 (10th Cir.1984)). The purpose of this requirement is to give the administrative agency the information it needs to investigate and resolve the dispute. *Khader,* 1 F.3d at 971. A claimant who abandons or withdraws his or her claim before the agency has reached a determination "cannot be deemed to have exhausted administrative remedies." *Id.* (quoting *Wade v. Secretary of Army,* 796 F.2d 1369, 1377 (11th Cir.1986)). *See, also, Rivera v. U.S. Postal Service,* 830 F.2d 1037, 1039 (9th Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988).

■ Although the Tenth Circuit does not require exhaustion of remedies for discrimination claims that are like or reasonably related to claims contained in the original EEOC charge, *see Brown v. Hartshone Public School District No. 1,* 864 F.2d 680, 682 (10th Cir.1988), plaintiff may not rely on that exception in this case. Plaintiff specifically alleged both claims in his EEOC complaint,

and then made the conscious decision to withdraw the religious discrimination claim. That plaintiff relied on ill advice of an EEOC investigator is of no avail. He does not claim that the EEOC investigator coerced or otherwise forced him to withdraw the claim.[3] Plaintiff voluntarily withdrew his claim of religious discrimination from the EEOC investigation and it is therefore barred by his failure to exhaust administrative remedies. Defendant's motion should therefore be sustained as to plaintiff's claim of religious discrimination.

### 2. *National Origin, Sex, and Age Discrimination*

■ Under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1978) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), plaintiff first must establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he was qualified for the job; (3) despite satisfactory performance, YFS subjected him to adverse employment action; and (4) YFS treated non-class members in the same or similar circumstances more favorably. *See Torre v. Federated Mut. Ins. Co.,* 854 F.Supp. 790, 803 (D.Kan. 1994). Once plaintiff establishes a prima facie case, the burden shifts to defendant to produce evidence that it terminated plaintiff's employment for legitimate, nondiscriminatory reasons. *Id.* at 802. If defendant satisfies this burden of production, the presumption of discrimination created by the prima facie case drops from the case and plaintiff must prove that defendant's action was motivated by intentional discrimination. *Id.* at 802–803.

■ Defendant does not dispute that plaintiff has established the first three elements of a prima facie case. Defendant contends that plaintiff cannot established the fourth element—that YFS treated similarly situated non-protected employees more fa-

---

**3.** The Court expresses no opinion as to whether such facts would warrant a different result, nor does the Court decide whether a claim of reli-

gious discrimination may be reasonably related to a claim of national origin discrimination.

vorably. In attempt to establish this element, plaintiff cites his own belief that Larrimer disciplined him and not the other employees for tardiness, an unclean desk, and sleeping on the job, when his behavior was no worse than the other employees. Plaintiff's own personal belief, without supporting evidence, however, is insufficient to create a genuine fact issue as to differential treatment. *See Brinkman v. State Dept. of Corrections,* 863 F.Supp. 1479, 1486 (D.Kan. 1994); *Chandelaria v. EG & G Energy Measurements, Inc.,* 33 F.3d 1259, 1261 (10th Cir.1994).

Plaintiff also claims differential treatment by alleging that Larrimer kept a log on him alone, and not the other employees in her department. In support of this contention he points to the fact that YFS personnel records do not contain any such logs for any other employee. The fact that a supervisor keeps a log, however, does not in itself work a material alteration of the terms and conditions of plaintiff's employment. Plaintiff points to no adverse action relating to the mere fact that Larrimer kept a log on him. Therefore, the allegation that Larrimer kept a log only on plaintiff would not satisfy the fourth element of a prima facie case. *See Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994). Thus, plaintiff has failed to produce sufficient evidence to support a genuine factual issue with respect to differential treatment and, therefore, he has failed to establish a prima facie case of discrimination.

Moreover, even if plaintiff had produced sufficient evidence to establish a prima facie case, he has failed to create a genuine issue of fact with respect to pretext. Defendant contends that it discharged plaintiff for his failure to follow supervisors' directions. In order to show pretext, plaintiff must demonstrate that YFS was more likely motivated by a discriminatory reason, or that YFS's offered explanation is unworthy of credence. *See Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994). In support of pretext, plaintiff relies on evidence that he is a member of certain protected

classes; that YFS did not terminate or put any other employee on probation, in whole or in part, for any of the same reasons it did plaintiff; and that plaintiff believes that other employees must have committed some of the same infractions. These assertions do not raise a triable issue as to whether YFS was motivated by discriminatory reasons or whether its stated reason for the discharge is false. On this record, the Court finds that plaintiff has failed to present sufficient evidence with respect to pretext. Defendant's motion should therefore be sustained as to plaintiff's claims of discrimination.[4]

### 3. *Breach of Contract*

Defendant argues that, as a matter of law, plaintiff cannot establish an express or implied employment contract. It points to language in the employment application which states that plaintiff's employment may be terminated with or without cause and that only the president of YFS has authority to enter into any contrary agreement, which must be in writing and signed by the employee and president. Defendant also contends that even if it could discharge plaintiff only for cause, the uncontroverted evidence establishes that it had cause to do so.

Plaintiff asserts that YFS breached express agreements concerning progressive discipline and an implied agreement that it would discharge him only upon cause. In support of the alleged express agreements on discipline, plaintiff cites to company policies which require that the supervisor give the true reasons for counseling; that the results of the employee's efforts to meet the program be measurable; that enough time be given to the employee to bring performance up to standard; that discipline be progressive; and that the supervisor inform the employee of the problem and give him or her sufficient opportunity to improve.

Under Kansas law whether an implied employment contract exists depends on the intent of the parties, which is normally a question of fact for the jury. *Morriss v.*

---

4. The Court would apply the same analysis to plaintiff's claim of religious discrimination, had he not failed to exhaust his administrative remedies with respect to that claim.

**848**

*Coleman Company*, 241 Kan. 501, 738 P.2d 841, 848 (1987).

> Where no definite term of employment is expressed, the duration of employment depends on the intention of the parties as determined by circumstances in each particular case. The understanding and intent of the parties is to be ascertained from their written or oral negotiations, the usages of business, the situations and object of the parties, the nature of the employment, and all the circumstances surrounding the transaction.

*Allegri v. Providence–St. Margaret Health Center*, 9 Kan.App.2d 659, 684 P.2d 1031, 1035 (1984).

 Plaintiff has produced the following evidence to support the existence of an implied contract: his understanding based on conversations with YFS managers that YFS would continue to employ him as long as he performed satisfactorily; YFS's progressive discipline policies; YFS's guarantee that employees are entitled to a review by the ERC before it may discharge them; and YFS's practice of terminating long-term employees only for cause. Together, these facts create a genuine issue of fact as to the existence of an implied employment contract. *See, e.g., Koopman v. Water District No. 1 of Johnson County, Kansas*, 972 F.2d 1160, 1165–66 (10th Cir.1992). Likewise, on this record, whether defendant's actions breached the agreement is also a fact issue for the jury.

### 4. *Promissory Estoppel*

 In the alternative, plaintiff claims promissory estoppel. Under Kansas law an employee may recover under promissory estoppel, in certain circumstances, where an employment contract is otherwise unenforceable, or where no employment contract exists at all (*i.e.*, where the employee is an employee-at-will). *See Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065, 1067 (10th Cir.1980); *Lorson v. Falcon Coach, Inc.*, 214 Kan. 670, 522 P.2d 449, 457 (1974). In order to prove promissory estoppel, plaintiff must show: (1) that defendant made a promise; (2) that defendant made the promise under circumstances which it intended and reasonably expected plaintiff to rely on the promise;

(3) plaintiff acted and reasonably relied upon the promise; and (4) refusal to enforce the promise would result in injustice. *See EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1454–55 (10th Cir.1990) (citations omitted).

 Plaintiff claims that defendant promised that his employment would be continuous, that there was a backlog of projects, that it would accommodate his relocation, and that it needed and valued plaintiff's expertise, education, and experience. In reliance on those promises, plaintiff asserts that he relocated his family to Kansas from New Jersey, induced his wife to resign from a professorship at Rutgers University, declined other employment opportunities, and abandoned a lucrative consulting business. On this record, factual issues preclude sustaining defendant's motion as to plaintiff's claim for promissory estoppel.

**IT IS THEREFORE ORDERED** that *Defendant Yellow Freight System, Inc.'s Motion for Summary Judgment* (Doc. # 38) should be and hereby is sustained as to plaintiff's claims of religious, national origin, sex, and age discrimination, and overruled as to plaintiff's claims of breach of employment contract and promissory estoppel.