**Mary HARRIS, Plaintiff,**

v.

**ECP HEALTHCARE, P.C., Defendant.**

**No. IP 95–1606 C B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 7, 1997.

Joseph E. Allman, Macey Macey & Swanson, Indianapolis, Indiana, for Plaintiff.

Kim F. Ebert, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, for Defendant.

## ENTRY

BARKER, Chief Judge.

This case, alleging race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, is before the court on defendant's motion for summary judgment. For the reasons discussed below, ECP's motion for summary judgment is **granted.**

## I. BACKGROUND

At all relevant times, defendant ECP Healthcare, P.C. ("ECP") operated a medical-claim processing office in Bloomington, Indiana.[1] Plaintiff Mary Harris ("Harris") is a white woman who has three biracial children from her marriage to an African–American man. Harris began her employment with ECP on November 25, 1992, through a temporary employment agency and commenced full-time employment as a data entry clerk on or about January 4, 1993. Harris was promoted to the position of patient representative in late-summer 1993, and remained in that position until her employment was terminated on July 28, 1994. From the beginning of Harris' employment until October 1993, the office manager in charge of supervising employees and handling employee relations matters was Alison Burns. In October 1993, ECP hired Vicki McPike to fill the role of office manager, giving her the title "Manager of Operations." McPike's supervisor was Roxanne Gann, Vice President of Billing.

### Harris' Employment Evaluations and Disciplinary Record

Harris was regarded by her co-workers at ECP as a good employee. In June 1994, she was recognized as "Employee of the Month," an honor based upon co-worker recommendations. ECP does not dispute that Harris performed her work well. Performance evaluations conducted by Harris' supervisors in July 1993, and January and July, 1994, were positive with regard to the quality of Harris' work. However, these same evaluations, along with Harris' disciplinary record, reflect that ECP was not as happy with Harris' behavior and attitude as they were with her work.

In Harris' January 1993 evaluation, Alison Burns commented that Harris needed "to not talk so much," that she "sometimes tends to get upset over things before knowing all the facts," and that she "needs to avoid gossip [and] have a better attitude towards team work." (McPike Aff., Exh. 3). Harris' January 1994 evaluation noted that Harris was "sometimes easily irritated" and needed to "have more patience, work on being more positive." (Id.) Her July 1994 evaluation noted that Harris needed to "keep on working on being more positive and just watch the negative comments about your job." (Id.)

Harris received formal discipline on two occasions prior to the July 27, 1994 incident which led to her termination. In January 1994, Harris received a verbal warning (documented in writing) from her immediate supervisor Terry Byers for making and receiving excessive personal phone calls during work hours. (McPike Aff., Exh. 4). On February 11, 1994, Harris was given a written warning for unprofessional and insubordinate behavior. The February 11 incident occurred when Vicki McPike was delivering paychecks to ECP employees. Harris had been notified that she would receive a raise, and was upset when she saw that her raise was not reflected on the February 11 paycheck. In the presence of other employees, Harris said to McPike "don't make me have to call my attorney." (McPike Aff., Exh. 5). Harris contends that this was said in a "joking manner," while McPike claims that Harris was loud and rude, and that Harris also loudly stated, in front of other employees,

---

**1.** In January 1996, ECP became part of a health care group known as Unity Physician Group, P.C. (McPike Aff. ¶ 3).

"You guys are ripping me off!" (McPike Aff. at ¶ 19). McPike also claims that she told Harris that she would discuss the matter with her after she was finished delivering paychecks, but that Harris refused to wait, saying "you will do it now," and that Harris later confronted her and "pointed her finger in McPike's face and shouted at McPike regarding the paycheck." (McPike Aff. at ¶ 19). McPike reported this incident to her supervisor Roxanne Gann. Gann and McPike considered terminating Harris for this behavior, but instead issued a written reprimand and warned Harris that another instance of disruptive or insubordinate behavior would result in her termination. (McPike Aff., Exh. 5; Gann Aff. at ¶ 11).

### ECP Policy regarding visitors in work areas

ECP claims that during the time Harris was employed at ECP, there was an informal unwritten policy against having visitors in the employee work area, and that this policy was formalized in writing and distributed to ECP employees in February or March 1994. The evidence is conflicting with regard to the existence, interpretations, and enforcement of any such policy. Harris claims, and we must accept her version of the facts for the purposes of summary judgment, that there was no policy at ECP, written or unwritten, providing that employees could not have visitors visit them in the employee work area. It is undisputed, however, that ECP promulgated a written policy in February 1994, titled "Policy for Visitors And/Or Off The Clock Staff", which provided that employee visitors could not "go past the front door unattended [by an employee]", and that any visits must be limited to five minutes. The policy provided further that employees who came to the office on their day off to pick up a paycheck were required to go through the main entrance, directly to McPike's office, and then directly out. (McPike Aff., Exh. 2).

### Instances of Alleged Disparate Treatment

Harris brings two separate claims against ECP: a disparate treatment race discrimination claim and a retaliatory discharge claim. The disparate treatment claim is based upon allegations that on two occasions ECP prohibited Harris' children from coming into the employee work area to visit her, whereas other employees' children and other relatives, all of whom are white, were frequently allowed to come into the employee work area. The first instance of alleged disparate treatment occurred in August 1993, when Harris' daughter Lessika came to the office to wait approximately fifteen minutes until. Harris got off work. Harris escorted her daughter to the employee break room to wait. Alison Burns, who was the office manager at the time, saw Lessika in the break room and asked Harris to take her up to the front reception area to wait. Harris complied, and was not disciplined for bringing her daughter into the employee work area and break room. (Burns Aff. at ¶ 4).

The second instance of alleged disparate treatment took place on July 27, 1994, when Harris' son Billy came into the office reception area and asked for his mother. Harris was on the telephone with an immediate care center at the time, and asked co-worker Middy Manship to escort her son to Harris' work area. McPike saw Manship escorting Billy into the work area and told her to take him back to the reception area. Harris received no discipline for attempting to have her son brought back to the work area. Harris was, however, suspended and then terminated for her behavior immediately following her son's visit.

### Events Leading to Harris' Termination

Harris claims that she was suspended and then terminated in retaliation for complaining about the race discrimination she perceived when her son was not allowed in the work area. ECP claims that Harris' son had nothing to do with her termination, and that she was terminated for rude, insubordinate behavior. The undisputed facts regarding the events culminating in Harris' termination are as follows. Upon learning from Manship that her son was not allowed to come into the work area, Harris complained to McPike (loudly, according to McPike) that ECP allowed other employees' children to come into the work area, but did not let her children do the same. McPike told Harris that the policy was that no children were allowed in the work area, and Harris began to tell McPike of other employees who had their children

come into the work area, but their conversation was cut short when the immediate care center came back on the line and Harris had to resume the telephone conversation.

Shortly thereafter, Harris put the immediate care center with whom she was having a telephone conversation, on hold and went to the data entry department to get a chart. Her son was still waiting for her in the reception area and Harris was admittedly very upset as she went to the data entry work area. The data entry work area was, like Harris' work area, a large open area in which employees worked at desks or in cubicles. (Harris Dep. at 53). Lori Evoy, the data entry supervisor, claims that as Harris was walking through the work area, Harris loudly referred to McPike as a "bitch". Harris denies calling McPike this name, but admits that she was very upset, and that she told another employee, Cathy Garofola, that she was "going to go round and round with Vickie McPike because she won't let my fucking son come in here." (Harris Dep. at 54; Harris Aff. at ¶ 13). Evoy, who was standing in another employee's cubicle, right next to where Harris was standing when she made this comment to Garofola, told Harris to be quiet and that if she had a problem with McPike, she needed to discuss it with McPike rather than in the open work area where others were working. Harris then proceeded to discuss a chart with Evoy, went back to her cubicle to finish her business with the immediate care center, and then went out to the reception area to talk to her son.

After this incident, Evoy reported to Roxanne Gann that Harris had come into the data entry area "cursing and talking very loudly and being very disruptive," and that she had called Vicki McPike a "bitch." (Gann Aff. at ¶ 12, Exh. 1). Evoy reduced her report to writing and submitted it to Gann. (Gann Aff., Exh. 1). Gann discussed the situation with other members of management and determined that Harris should be suspended pending an investigation regarding her behavior in the data entry department. Gann called a meeting that afternoon with Harris, Evoy, Gann, McPike, and Tabby Hill (another supervisor at ECP). During that meeting, Gann told Harris she was suspended pending an investigation into her behavior in the data entry work area earlier that day. Harris denied calling McPike a "bitch," and stated that ECP was discriminating against her and her children by not allowing her children to come into the work area. Gann told Harris the issue was not Harris' son, but her behavior. The following day, Gann told Harris that she was terminated. (Harris. Aff. ¶ 17).

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.Pro.* 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Methodist Medical Center v. American Medical Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994).

In considering a summary judgment motion, a court must draw all justifiable inferences in the light most favorable to the opposing party, and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991); *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990). "The moving party is 'entitled to a judgment as a matter of law' [if] the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

## III. ANALYSIS

■ We apply the same analysis to § 1981 and Title VII discrimination claims. *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 176 (7th Cir.1996) *citing Pilditch v. Board of Education of City of Chicago,* 3 F.3d 1113, 1116 (7th Cir.1993), *cert. denied,* 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994). Harris can satisfy her burden of proof on both her disparate treatment claim and her retaliatory discharge claim either with direct evidence of racial discrimination, or by the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't. Of Comm. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir., Jan. 23, 1997). Harris attempts to use both methods, and we will address each in turn.

### A. Direct Evidence

■ The Seventh Circuit defines direct evidence as "evidence which 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Plair,* 105 F.3d at 347. The direct evidence must show that the defendant said or did something indicating racial animus with regard to the "specific employment decision(s) in question," here, the decision to not allow Harris' children to come into the employees' work area, and the decision to suspend and then terminate Harris. *Id.*

■ Harris' direct evidence of racial animosity includes Lori Evoy's deposition testimony that, in response to hearing that Harris had called McPike a "bitch", Tabby Hill told Evoy that she was not surprised and that "she didn't like Mary anyway and she was nothing but a nigger-lover." (Evoy Dep., at 20–21). This type of comment is unacceptable in civil society and cannot be condoned. However, it is an isolated comment made by someone who, while present at the meeting at which Harris was suspended, did not make the decision to suspend or terminate her, and who played no role in the decisions to not allow Harris' children into the work area. (Harris Dep. at 43). Fur-

thermore, Harris does not contend that this comment was made by way of explaining why Harris was, or should be, suspended or terminated.

■ Harris has also produced evidence that Evoy heard McPike say at some point that she felt sorry for Harris' children because they were half black and half white. Harris does not contend that this comment was at all connected with any of the complained of employment decisions, indeed, there is no indication of when or where or to whom this comment was made. Furthermore, McPike has provided a satisfactory explanation of this comment, explaining that after overhearing Harris accusing her landlord of discriminating against her because of her biracial children, McPike told Evoy that she "felt sorry for Harris' children because Harris was always making an issue about the fact that her children were biracial." (McPike Aff. at ¶ 23).

The evidence does not show, and Harris does not contend, that anyone involved in the decisions to not allow her children into the work area or to suspend and terminate Harris said or did anything indicating that those decisions were made because her children are biracial or because of her association with African Americans. In fact, the evidence is undisputed that Harris was told that the decision to suspend her had nothing to do with her children. Therefore we conclude that Harris has failed to produce the kind of direct evidence of discriminatory motive necessary to support a Title VII claim using the direct method of proof.

### B. McDonnell Douglas/Burdine burden-shifting method

#### 1. Disparate Treatment Claim

■ To succeed on her disparate treatment claim under the *McDonnell Douglas–Burdine* burden-shifting test, Harris must first establish a prima facie case of racial discrimination by a preponderance of the evidence. *Sample v. Aldi,* 61 F.3d 544, 547 (7th Cir.1995), *reh'g denied.* To establish a prima facie case, Harris must show that (1) she is a member of a protected class, (2) her job performance met ECP's legitimate expecta-

tions, (3) she suffered an adverse employment decision, and (4) other similarly situated employees, not of the protected class, were treated more favorably. *Atkins v. Board of School Com'rs of City of Indianapolis,* 830 F.Supp. 1169 (S.D.Ind.1993); *Plair,* 105 F.3d at 347.

ECP does not dispute Harris' membership in a protected class, but contends that Harris has failed to establish the second, third and fourth prongs of the prima facie case. Specifically, ECP claims (1) that Harris was not meeting ECP's legitimate expectations; (2) that ECP's actions in not allowing Harris' children into the work area did not constitute an adverse employment action because they did not affect the terms and conditions of Harris' employment; and (3) that Harris has failed to show that employees who did not have biracial children were systematically treated more favorably than she was with regard to having their children come into the work area.

### a. ECP's Legitimate Expectations

 Although ECP has documented that Harris' behavior and attitude at work needed to be improved, we cannot say that Harris has failed to satisfy the second prong of the prima facie test. The Seventh Circuit has established that a "determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning [her] work." *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1114 n. 35 (7th Cir.1992), *quoting Williams v. Williams Elecs., Inc.,* 856 F.2d 920, 923 n. 6 (7th Cir.1988). Here, we need not rely solely on Harris' subjective assessment of her performance. Even considering the unfavorable remarks about Harris' attitude and behavior, each of Harris' performance evaluations gave her high marks for her work performance, and an overall rating of "good." (Pltf. Exh. 18; McPike Aff., Exh. 3). Therefore, we

conclude that Harris has satisfied her burden of proof as to the second prong of the prima facie test.

### b. Adverse Employment Action

Before discussing whether Harris has shown that she suffered an adverse employment action, we must be sure to distinguish Harris' disparate treatment claim from her retaliation claim. Without a doubt, Harris' suspension and termination were adverse employment decisions. Those decisions are not, however, the basis of Harris' disparate treatment claim, which is based solely on Harris' allegations that ECP did not allow her children to come into the work area because of their race. (*See,* Pltf. Ans. To Interrog. 3, Def. Exh. 12).

 In order to show that she has suffered an adverse employment action, Harris must show that ECP's treatment of her affected the "terms or conditions of employment." *King v. Board of Regents of University of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990), *reh'g denied.* This prong of the prima facie test is usually easily met, because disparate treatment cases often involve termination of employment, failure to hire or to promote, or the loss of some tangible job benefit such as compensation, vacation time, or tenure. Although some cases have considered other aspects of a plaintiff's employment to be "terms and conditions of employment," plaintiff has provided no case law, and we have found none, indicating that the ability to have one's children come into the employee work area should qualify as a "term or condition of employment," denial of which might amount to a violation of Title VII.[2] We, therefore, find that Harris has failed to establish the third prong of a prima facie case of disparate treatment.

### c. More favorable treatment of other employees.

 Even if the ability to have one's children come into the employee work area

---

**2.** *Compare Collins v. State of Ill.,* 830 F.2d 692, 699 (7th Cir.1987) (black employee who was evaluated by supervisor more frequently than other employees, and whose evaluations were negative, unlike evaluations performed by previous supervisors, established adverse employment decision), *with Sharon v. Yellow Freight System, Inc.,* 872 F.Supp. 839, 847 (D.C.Kan.1984) (keeping a log of employee's activity did not in itself work a material alteration of the terms and con-

was a "term or condition of employment," Harris' failure to show that ECP systematically allowed the white children · of other employees to be in the work area is fatal to her disparate treatment claim. *E.E.O.C. v. Our Lady of Resurrection Medical Center,* 77 F.3d 145, 151 (7th Cir.1996); *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (must be evidence that non-protected employees received "systematically better treatment").[3]

Harris contends that supervisors and other employees frequently had their children, who are white, come into the work area, and that she and some other employees had the impression that having visitors in the work area was an open and obvious practice, of which ECP management was aware.[4] Although Harris provides evidence of a number of employees who brought their (white) children into the work area, there are only a few occasions for which there is evidence that ECP management was aware that the children were in the work area. Harris concedes that, other than the time that Allison Burns brought her children into the office, she was only personally aware of two employees who brought their children into the work area while they were working, and that she did not know if Allison Burns (who was

office manager at the time) was aware of their presence. (Harris Dep. at 29).[5]

At any rate, even if ECP management did sometimes turn a blind eye to the presence of employees' children in the work area, the evidence establishes that they did not always do so. ECP has come forward with solid evidence, undisputed by Harris, that during the course of Harris' employment it told at least two other employees, whose children are white, that they could not have their children in the work area. Debra Martin has affirmed that in April 1994, she has her young daughter, who is white, with her at the office and that McPike informed Martin that her daughter would have to wait in the reception area. (Martin Aff. ¶ 6–8; McPike Aff. ¶ 9).[6] On another occasion prior to Harris' termination, Angela Stevens had her son, who is white, with her in the work area, when either McPike or Gann approached her and instructed her to take her son to the reception area. (Stevens Aff. ¶ 10; McPike Aff. ¶ 9)[7] At best, the evidence shows that ECP management was either not very watchful, or simply allowed or did not allow employees' children to come into the work area in a rather arbitrary and perhaps unfair fashion. There is, however, no evidence to support a

ditions of employment), *aff'd,* 107 F.3d 21 (10th Cir.1997).

3. Harris contends that summary judgment must be denied because there is a question of fact as to the existence of a policy against having children in the work areas. We disagree. Harris' disparate treatment·claim will survive or fail depending on whether she has shown that ECP systematically treated her children differently from other employees' white children with regard to allowing children into the work area. The existence of an official policy, written or unwritten, is immaterial.

4. Harris states that on the afternoon before the day she was asked to have·her daughter wait in the reception area, Allison Burns had her two sons wait for her in the employee break room. (Harris. Dep. at 20). Evidence that ECP managers or supervisors allowed their own children into the work area or break room does not itself support an inference of discrimination, because managers and supervisors are not similarly situated to Harris. Harris also testified that Tabby Hill's husband sometimes came in near the end of Hill's shift to pick her up on days when the weather was bad. (Harris Dep. at 65–66) Not only was Hill a supervisor, and thus not similarly

situated to Harris, but there is also a significant difference between allowing children in the workplace and allowing an employee's adult spouse come in to pick up her up at the end of the day.

5. There is evidence that employees often brought their children with them when they came into the office on payday, when they were not working, to pick up a paycheck. ECP does not dispute that it allowed employees to do this. (McPike Aff., Exh. 2; Burns Aff. at ¶ 3). We will not consider those employees who came in with their children on their day off to pick up a paycheck or some other item, to be similarly situated to Harris, who was prevented from bringing her children into the work area on days when she was at work.

6. While Harris contends that the Martin incident happened after Harris' termination, Martin maintains that she is certain that it occurred before Harris was terminated. (Martin Aff., at ¶ 8).

7. McPike also recalled asking Deanna McCammon to have her children, who are white, wait in the reception area. McCammon, however, does not recall any such occurrence. (McPike Aff. At ¶ 9, Dep. At 25; McCammon Dep. At 10).

finding that ECP made these decisions in a *racially discriminatory* fashion. *See E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir.1992). ("Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected 'class characteristics.")

For the above reasons, we find that Harris has failed to establish that she suffered an adverse employment decision, and that other similarly situated employees, not in the protected class, received systematically better treatment, and has therefore failed to establish a prima facie case of disparate treatment. Accordingly, we grant ECP's motion for summary judgment as to Harris' disparate treatment claim.

### 2. Retaliatory Discharge Claim [8]

 To establish a prima facie case of retaliation, Harris must show that she engaged in statutorily protected expression, she suffered adverse employment action, and that there is a causal link between the protected expression and the adverse action. *Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994), *citing Holland v. Jefferson Nat. Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989), *reh'g denied.* If Harris carries her initial burden of establishing a prima facie case, the burden of production then shifts to ECP to articulate a legitimate, nondiscriminatory reason for its actions. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 135 (7th Cir.1993), *citing Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 248, 101 S.Ct. 1089, 1090, 67 L.Ed.2d 207. Once ECP has presented a legitimate, nondiscriminatory explanation for Harris' termination, if Harris cannot then show any evidence that ECP's explanation is pretextual, then summary judgment may properly be granted. *Lenoir*

*v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

Harris claims that her behavior on July 27, 1994, was statutorily protected conduct because she was complaining of race discrimination, and that she was terminated in retaliation for that protected conduct. While we have no doubt that Harris' termination was causally connected to her conduct, we find that the disruptive, crude and insubordinate nature of her conduct both removes that conduct from the protective ambit of Title VII, and provides a legitimate non-discriminatory reason for her termination.

### a. Statutorily Protected Conduct

The Seventh Circuit's standard for determining whether an employee's complaints exceed the scope of Title VII protection is whether the employee engaged in "unreasonable conduct." *Jennings v. Tinley Park School Dist.*, 864 F.2d 1368, 1372 (7th Cir. 1988). Courts have consistently held that the anti-retaliation protections of Title VII do not immunize employees from disciplinary termination for violations of company policy, irrespective of whether the violations were committed in response to perceived discrimination. *See Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1390 (8th Cir.1988) (Plaintiff's efforts to obtain statement of co-worker, using work time and disturbing and disrupting the co-worker, were the "last straw," and plaintiff's termination was justified), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.1976) (no retaliation claim where employee, in pursuit of anti-discrimination claims, bypassed her supervisor in complaining to management, disrupted the work of others, and left her work area); *EEOC v. Mead Foods, Inc.*, 466 F.Supp. 1, 4 (W.D.Okla.1977) ("Though [plaintiff] no doubt had strong feelings that

---

**8.** Although Harris did not check the "retaliation" box on her EEOC charge, the charge did contain factual allegations sufficient to put ECP on notice of a retaliation claim. *See, EEOC Charge* ("Ms. Harris complained to management after the second discriminatory incident with her child.

Management accused Ms. Harris of calling one of the managers a name and terminated her."). Therefore, ECP's suggestion that Harris' retaliation claim is foreclosed for failure to exhaust administrative remedies is unfounded.

her demotion was based on sex, she was not entitled to take the law into her own hands and create disruption and disloyalty in the operation of her employer.").

 It is certainly understandable that Harris would be upset if she believed that her children were being treated differently because of their race. We cannot, however, characterize her conduct—audibly complaining about management in an open work area, stating that she and McPike were "going to go round and round" because McPike would not let her "fucking son" come into the work area—as reasonable, especially in light of the fact that she had previously been warned that if she engaged in such conduct again, she would be terminated. Therefore, we find that Harris' conduct is not protected by the anti-retaliation provisions of Title VII.

### b. Pretext

 Even if Harris had established that she engaged in statutorily protected conduct, her retaliation claim still fails because she has failed to show that ECP's proffered reason for terminating her employment was pretextual. "A pretext, in employment law, is a 'phony reason' that the employer offers for engaging in discriminatory conduct (e.g. firing an employee because of [her race] and claiming it was for some other reason)." *Mills v. First Federal Sav. & Loan Ass'n.*, 83 F.3d 833, 845 (7th Cir.1996) (citation omitted). In deciding whether a defendant's reasons were pretextual, the court must examine whether the employer honestly believes in the reasons it offers, not whether the employer made a bad or wrong decision. *Sample*, 61 F.3d at 549; *Kralman v. Illinois Dept. Of Veterans' Affairs*, 23 F.3d 150, 156–57 (7th Cir.1994) (pretext inquiry limited to "whether the employer have an honest explanation of its behavior"), *cert. denied*, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994). Harris can prove that ECP's proffered reason for its decision to suspend and terminate her are pretextual either:

(1) by showing that a discriminatory reason more likely than not motivated the employer (i.e., that the company's proffered reasons were not the sole determining factor in addition to the proffered reasons); or (2) that the employer's proffered explanation is unworthy of credence.

*Kralman*, 23 F.3d at 156. In attempting do so, Harris "must *specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills*, 83 F.3d at 845, *quoting Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir.1995) (emphasis added in *Mills* ).

 ECP has satisfied its burden of production by advancing a legitimate nondiscriminatory reason—that it suspended and terminated Harris for her disruptive and insubordinate conduct on July 27, 1994, considering her prior reprimand and warning that any further disruptive and insubordinate conduct would lead to her termination. Harris argues that ECP's proffered reason is pretextual because she did not call Evoy a "bitch." She also contends that no other employee supported Evoy's report that Harris had called Evoy a "bitch." The issue is not whether Harris, in fact, called Evoy a "bitch," or even whether ECP honestly believed that she did,[9] but rather, whether ECP honestly believed that Harris had engaged in disruptive and insubordinate behavior that justified her termination.

Harris does not deny that she told Cathy Garofola that she and McPike "are going to go round and round" because McPike "wouldn't let my fucking son back to my desk or back to my office." (Harris Dep. at 54, Harris Aff. at ¶ 13). This admission alone is probably enough to sound the death knell for Harris' pretext argument, but there is more. After suspending Harris on the basis of Evoy's report, ECP interviewed employees who had witnessed Harris' behavior in the data entry work area, and found that those interviews not only confirmed Evoy's report that Harris had been disruptive and insubordinate, but indicated that Harris had en-

**9.** Despite Harris' claim to the contrary, Evoy's report that Harris called McPike a "bitch" was supported by the report of at least one other employee in the data entry department. Sharman Lewis testified in her deposition that she heard Harris refer to McPike as a "bitch," loudly enough that other people could hear (Lewis Dep. At 9–10), and McPike testified that both Lewis and Evoy told her that they had heard Harris call McPike a "bitch." (McPike Dep. at 22).

gaged in similar behavior on other occasions as well. A written statement from McPike, dated July 26, 1994, indicates that both Cindy Briscoe and Lori Evoy had asked McPike to talk with Harris because "she's coming in to their departments being loud and complaining." (Pltf.Exh. 20). In addition, the record reflects that the following written and signed statements were submitted to ECP management on July 27, 1994: statement of Elaine Kendrick indicating that Harris came into the data entry area and said that "Vicki McPike and I are going to have it out ... She can kiss my fucking ass." (Pltf.Exh. 21); and statement of Denise Grogen indicating that Harris "started to tell everyone that came through the area" about the incident with her son, that Grogen heard Harris complaining at lunch, and that Harris said she and McPike were "going to go around." (Pltf.Exh. 22). The record also includes written, signed statements by Terry Byers, Allison Burns and Cathy Briscoe indicating that Mary had been "bothering Denise," that she had gotten into a "yelling match" on the telephone with the superintendent at her childrens' school, and that she was "always talking about the company ... [and] about someone in a negative manner" (Pltf. Exh. 24); that Burns had to tell Harris several times to quiet down because she was disrupting others while they were trying to work, and that Harris was "always loud and disruptive" (Pltf.Exh. 25); and that Briscoe heard Harris "talking loudly and disrupting people" in the patient-rep area, and that on numerous occasions Harris talks very loudly and Briscoe often had to ask her to quiet down. (Pltf. Exh. 26).

This is more than enough evidence to show that ECP's proffered reason for terminating Harris' employment was not pretextual, particularly in light of the fact that Harris' record reflected that she had been advised on February 11 that any more instances of such behavior would result in termination. (See Gann Aff. ¶ 15). Harris has not produced any evidence whatsoever to refute the documented evidence of her disruptive behavior. (Indeed, we note that much of the documentation is contained in Harris' own appendix of supporting material). Because we find that Harris' disruptive and insubordinate behav-

ior on July 27, 1994, falls outside the protective ambit of the anti-retaliation provisions of Title VII, and alternatively, that Harris has failed to show that ECP's legitimate non-discriminatory reason for firing her was pretextual, we grant ECP's motion for summary judgment as to Harris' retaliatory discharge claim.

### IV. CONCLUSION

For the reasons discussed above, the court finds that Harris has failed to prove both her disparate treatment and her retaliation claim, and **grants** ECP's motion for summary judgment in its entirety.

It is so ORDERED.