Janet METCALF and Charlene
C. Davis, Plaintiffs,

v.

METROPOLITAN LIFE, INC., a New
York Corporation; Gary Napel; Andrew
Loomis; and Susan Despain, Defen-
dants.

Civil No. 2:95–CV–0995 B.

United States District Court,
D. Utah,
Central Division.

April 10, 1997.

Lincoln W. Hobbs, Winder & Haslam, Salt Lake City, UT, for Plaintiffs.

Janet Hugie Smith, Ray Quinney & Nebeker, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

BENSON, District Judge.

### I. Introduction

This matter is before the court on defendant Metropolitan Life, Inc.'s ("MetLife"), Gary Napel's; Andrew Loomis', and Susan Despain's (collectively "Defendants") motion for summary judgment against Plaintiffs Janet Metcalf and Charlene C. Davis (collectively "Plaintiffs"). Plaintiffs brought this action against Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging "hostile environment" sexual harassment, retaliation, constructive discharge, and disparate treatment. In addition, Plaintiffs present pendent state claims based on intentional infliction of emotional distress against Napel, Despain, and MetLife; negligent retention against Met-Life; and tortious interference with prospective economic relations against Napel and Despain. On March 7, 1997 a hearing was held on Defendants' motion. Jennifer L. Falk and Linda W. Hobbs represented Plaintiffs. Robert O. Rice and Janet H. Smith represented Defendants. The court took the matter under advisement. Now being fully advised, the court enters the following memorandum decision and order.

### II. Background

Plaintiffs Metcalf and Davis were MetLife Account Representatives and worked at MetLife's Temple Square Office at the time of the alleged instances.

*Janet Metcalf*

Metcalf was hired by MetLife in August of 1993. Metcalf claims her time with MetLife was plagued by the presence of defendant Napel, her branch manager, who made frequent sexual remarks to her individually and in front of other employees, including offensive jokes and comments about her sex life, clothing, breast augmentation, and whether she slept with clients. Napel also allegedly asked inappropriate personal and sexual questions and made lewd requests in closed-door weekly business meetings. Specific examples of Napel's alleged conduct include Napel's (1) commenting that "he'd do her," (2) asking Metcalf to "go[ ] down on him," (3) telling a co-worker that Metcalf gets "more ass than a toilet seat," (4) asking Metcalf if she was "screwing" or sleeping with her clients; (5) making lewd comments such as "Metcalf gives me a woody," and (6) flipping Metcalf's bra strap.

Metcalf also claims that defendant Despain and others also contributed to a vulgar atmosphere at the Temple Square Office, where crude jokes, comments about strippers, and wisecracks about "who Metcalf was doing," were often told. Loomis, MetLife's Regional Vice President and Napel's close friend and direct supervisor, allegedly condoned this environment by failing to respond to the inappropriate conduct that he witnessed. Once, after observing some questionable conduct, Loomis allegedly told Metcalf that she would not have to endure the harassment anymore after she qualified for "leaders."

In February of 1994 Metcalf was placed on probation for the stated reason that she was at risk of not validating under her contract.[1] As 1994 came to a close, Metcalf's sales fell precipitously, purportedly due to the sexual

1. Both plaintiffs signed contracts in which they agreed to place insurance at a certain level, called validating, each quarter. Failure to reach this level could mean probation and ultimately termination. Metcalf argues however that probation was improper and premature because, pursuant to her contract, she had nineteen more weeks to validate and then yet another quarter to validate before her job should have been in jeopardy.

harassment and the resulting hostile work environment.

On December 28, 1994 Metcalf contacted Richard Calogero in MetLife's Human Resources ("HR") Office to make a sexual harassment complaint against Napel. Prior to this call, Metcalf had never complained to anyone outside of Metcalf's office or to any superior of Napel. One reason for this, Metcalf suggests, is that she had no idea how to lodge a complaint. She also claimed to fear defendant Loomis whom she felt could make or break her career and would side with Napel. Metcalf had, however, complained to Napel and several others in her office and Loomis had witnessed instances of improper behavior and dirty jokes at the Temple Square Office.

After discussing her complaints with Calogero, Metcalf accepted his suggestion that she go on leave during MetLife's investigation of her complaint. It is undisputed that once Metcalf lodged her complaint with Calogero, she was never again sexually harassed by any of the defendants. While on leave, Metcalf continued to receive her salary but, because she stopped selling insurance, her income was reduced by about $400.00 per month.

On December 29, 1994, Tina Ballestrasse, an HR officer for MetLife's western territory, contacted Metcalf regarding her complaints. Ballestrasse then commenced an investigation by interviewing fifteen co-employees. Only three of the fifteen people interviewed, including plaintiff Davis, corroborated even some of Metcalf's allegations. Ballestrasse also learned that Metcalf had made "inappropriate" sexual remarks such as "if you weren't my boss, I'd do you in a second."

Metcalf is highly critical of Ballestrasse's investigation. She argues that Ballestrasse (1) took either inaccurate or incomplete notes of the interviews she conducted; (2) failed to interview other former employees specifically mentioned as witnesses of the sexual harassment; (3) neglected to follow up on the potential bias of witnesses Despain, Napel's

fiancee, and Becky Senese, a close friend and former sexual partner of Napel; (4) failed to ask questions regarding Metcalf's allegations such as whether Napel had been accusing her of sleeping with customers; and (5) never interviewed Napel but instead accepted a written response from him. Metcalf also complains that, by allowing Napel to remain at the Temple Square Office while she was on leave, Napel was able to build his support and taint the workplace against her. After over two months of investigation and despite the "inconclusive" evidence against Napel, MetLife concluded that "Napel's behavior was inappropriate for an Agency Manager" and disciplined Napel by demoting him and relocating him to MetLife's Midvale, Utah Office, approximately fifteen miles from the Temple Square Office. Evidence suggests that this decision may have been made as early January 24, 1995 but Napel did not leave the Temple Square Office until March 7, 1995.

On March 9, 1995 Metcalf returned to the Temple Square Office. This same day, Loomis met with Metcalf to assure her that MetLife had conducted a thorough investigation, that Napel would no longer work at the Temple Square Office, and that Metcalf would be reinstated to the level she was at prior to her leave. He then criticized her, however, for her lack of performance during the leave. Metcalf argues this was an instance of retaliation because she could not properly do her work without going to the office and she was not receiving forwarded mail or telephone messages while at home. Her predicament while on leave was further exacerbated by her belief that Senese was hostile to her. A working relationship with Senese was necessary to access company information. Metcalf also argues that MetLife's demand that she place the same amount of insurance that she would have placed were she not on leave was not only unreasonable because of her above concerns, but also because she understood that she would have no work-related responsibilities during her leave.[2] Metcalf's other allegations of retaliation include Senese beginning

---

2. Metcalf's notes from her conversation with Calogero indicate that she "would pick up where [she] left off when [she] returne[d] to work."

an investigation against both Metcalf and Davis at about the time they complained about the harassment, MetLife allowing a number of her policies to lapse while she was on leave,[3] and learning from a co-worker that MetLife management removed a sexual harassment poster from the office, told agents she was suspended, and was supporting Napel.

Later in the morning of March 9, 1995, Loomis convened a meeting to inform employees at the Temple Square Office, including Metcalf and Davis but not including Napel, about Napel's fate. Some of the agents were angry that Napel had been demoted and defendant Despain, among others, circulated petitions supporting Napel. Metcalf's name never came up at this meeting, but it can be assumed that everyone knew of the participants. After the meeting, Metcalf left the office and has had no further contact with any defendant since March 9, 1995.

*Charlene Davis*

Davis began working for MetLife in March of 1993. Davis admits her negative experiences were less frequent and less severe than Metcalf's, but nevertheless asserts that the incidents she suffered give cause to the same claims as Metcalf Davis alleges the following incidents of sexual harassment: (1) In 1993 Napel pinched her bottom; (2) Napel jokingly asked Davis about her sex life in January, 1994, but after she told Napel to stop, Davis provides no evidence of further "sexual harassment"; (3) Napel asked Davis who the father of her baby was (Davis became pregnant in January of 1994); and (4) she was told by others that she was "Gary's girl" and inferred from his mannerisms that he was sexually interested in her. Davis never complained to anyone outside of her office about sexual harassment, but claims to have complained to others within the office.

Davis argues she was retaliated against at least partially because of her willingness to corroborate Metcalf's allegations against Napel. Despain came to Davis's house to inquire about how Davis would respond in her interview with Ballestrasse regarding Metcalf's allegations against Napel. When Despain learned what Davis would tell Ballestrasse, Despain allegedly tried to change Davis' story. On January 3, 1995 Metcalf corroborated many of Metcalf's allegations and told Ballestrasse of a number of retaliatory incidents which had already occurred. Ballestrasse told Davis to notify her of any further incidents of retaliation, but Davis never contacted Ballestrasse to complain about retaliation. Davis' other allegations of retaliation include: (1) Despain's attitude was openly hostile toward Davis and she encouraged other agents to act likewise toward Davis; (2) Davis felt uncomfortable in the office because she thought others were glaring at her and were intimidated to associate with her; (3) Despain and another agent tried to have Davis's car towed from an improper parking spot; and (4) Senese's investigation of Davis and Metcalf.

Davis also complains that in April of 1994, Napel removed Davis' Book of Business which she did not discover until approximately nine months later. Book of Businesses contain an agent's "orphan policies" (policies given to agents not previously assigned to a particular agent) and agents' own policies which they developed. Book of Businesses are typically taken when an agent fails to place insurance policies, but Davis alleges retaliatory motives to this taking.

After Metcalf's complaint to Calogero, Davis wanted to transfer from the Temple Square Office, but it was never worked out because Davis wanted to go to Midvale and leave Napel at the Temple Square Office. Davis concedes however the obvious difficulty in her request that Metcalf was to remain at the Temple Square Office when the goal for MetLife was to keep Napel away from Metcalf. Davis applied for a job with Massachusetts Mutual Insurance Company ("Mass.Mutual") in May of 1995, the same month she asked for a transfer from MetLife's Temple Square Office. On June 19,

---

3. Policies lapse when policy holders fail to pay premiums on a timely basis. Metcalf could monitor the payments, but "had not been advised she should do so." Metcalf alleges that Napel inter-fered with her client relationships by instructing Senese and other staff members not to forward mail and telephone calls.

1995 Davis quit MetLife and had already started work with Mass. Mutual.

## III. Summary Judgment

Summary judgment is proper "if the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to establish the existence of an essential element to the claims and on which they bear the burden of proof at trial. *Id.* To satisfy this burden, the non-movant cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's case is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## IV. Title VII

### A. *Sexual Harassment* [4]

Plaintiffs claim that they were sexually harassed in violation of Title VII. Title VII prohibits sexual harassment in the workplace. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There are two distinct forms of sexual harassment under Title VII: quid pro quo (i.e. when submission to sexual conduct is made a condition of employment opportunities) and hostile work environment. Plaintiffs allege only the latter.

Hostile work environment was first recognized by the courts as a form of harassment in decisions dealing with discrimination based on race. *See Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Subsequently, courts began applying hostile work environment to harassment based on gender, *see, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, and other protected groups.

A hostile work environment claim arises when conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05 (quoting 29 C.F.R. § 1604.11(a)(3) (1986)). The predicate conduct need not be pruriently or even sexually motivated, but it must occur because of the victim's gender. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987) (conduct that would not occur but for the employee's gender may be actionable under Title VII) (citing *McKinney v. Dole,* 765 F.2d 1129 (D.C.Cir.1985)). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

Once it is determined that the conduct amounted to sexual harassment to a member of a protected class, the plaintiff must then establish that the employer either provided no reasonable avenue for complaint or that the employer knew or should have known of the conduct and failed to take appropriate action. *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572 (10th Cir.1990); *see Vinson,* 477 U.S. at 70–71, 106 S.Ct. at 2407 (to establish that plaintiff was subjected to a hostile employment environment, she must

---

**4.** Plaintiffs correctly concede that lawsuits under Title VII against individuals are barred in the Tenth Circuit. *Haynes v. Williams,* 88 F.3d 898, 901 (10th Cir.1996). Accordingly, Plaintiffs' Title VII claims against Napel, Loomis, and Despain are dismissed.

establish that the conduct which created the hostile situation should be imputed to the employer).

■ In a quid pro quo case, employers are strictly liable for a supervisor's harassment. *E.g., Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989). In the early development of hostile environment cases, courts used the same standard and generally imposed absolute vicarious liability on employers for its employees' acts. *Vinson,* however, called this reasoning into question by concluding that the Court of Appeals for the District of Columbia erred in holding that the employer was automatically liable for hostile environment sexual harassment by the supervisor. *Vinson,* 477 U.S. at 72, 106 S.Ct. at 2407–08. The Court stopped short of proclaiming an absolute standard for Title VII cases, but did offer guidance for lower courts to decide the liability of employers. The Court adopted the Equal Employment Opportunity Commission's ("EEOC") position that courts should follow traditional agency principles to determine liability. Such an analysis requires that a distinction be made between a quid pro quo and hostile environment claim. The Eleventh Circuit succinctly states this distinction.

> Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no quid pro quo exists. The supervisor acts outside "the scope of actual or apparent authority to hire, fire, discipline, or promote." Corporate liability exists only through respondeat superior; liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor.

*Steele,* 867 F.2d at 1316 (quoting *Henson,* 682 F.2d at 905).

### 1. *Davis' Title VII Claim*

■ As an initial matter, the court finds that Davis' complaint was untimely. Title VII requires a plaintiff to file a complaint with the EEOC within 180 days of the alleged violation or within 300 days with a State agency. 42 U.S.C. § 2000e–5(e)(1). Examining Davis' claims in the most favorable light, the most recent incident occurred only as late as January of 1994. Davis did not file her claim with the Utah Anti–Discrimination Division ("UADD") until March 15, 1995, more than three months too late. Davis contends, without proof or explanation, that her complaint was timely because the sexual harassment she encountered was part of a continuing violation. Even under the continuing violation doctrine, however, "[t]here must ... be at least one instance of the discriminatory practice within the filing period for the doctrine to apply...." *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1415 (10th Cir.1993). Davis has presented no evidence of a later occurring incident and her sexual harassment claim is accordingly time barred and must be dismissed.

### 2. *Metcalf's Title VII Claim*

■ For the purpose of summary judgment, the court finds Metcalf has alleged sufficient facts of a hostile working environment. Defendants do not actively contest this, but rather address the more difficult question of whether MetLife may be held liable for Napel's actions. In order to prove MetLife's liability, Metcalf must show one of the following: "(1) [that Napel] was acting 'within the scope of his employment,' (2) [that MetLife] 'failed to remedy a hostile work environment brought about by the sexual harassment of which [MetLife] knew or should have known,' or (3) [that Napel] 'acted under apparent authority from [MetLife].'" *Creamer v. Laidlaw Transit. Inc.,* 86 F.3d 167, 170–71 (10th Cir.1996) (quoting *Griffith v. State of Colorado, Div. of Youth Services,* 17 F.3d 1323, 1330 (10th Cir.1994)); *see Hirschfeld,* 916 F.2d at 576–80.

■ The court sees no basis for liability under categories (1) and (3). *See Hirschfeld,* 916 F.2d at 576 (explaining the "scope of employment" category is "largely inapposite in sexual harassment cases because sexual harassment simply is not within the job description of ... any ... worker in any reputable business" (internal quotation marks and citation omitted)). Category (2) requires more discussion and the court ultimately concludes that whether MetLife is liable under that category poses a genuine issue of mate-

rial fact. MetLife "incurs liability by recklessly or negligently 'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" *Creamer*, 86 F.3d at 171 (quoting *Hirschfeld*, 916 F.2d at 577 (internal quotation marks and citation omitted)).

In the instant case, Metcalf has produced sufficient evidence to go to a jury on the question whether MetLife had constructive notice of the sexual harassment through its agent, Loomis. Metcalf alleges that Loomis observed sexual harassment and improper conduct on several occasions and Loomis concedes hearing offensive comments at the Temple Square Office.[5] The court notes, however, that even assuming that Loomis was sufficiently on notice of hostile conditions toward Metcalf, it remains an issue of fact whether Loomis' knowledge should be imputed to MetLife.

### B. *Retaliation*

■ According to 42 U.S.C. § 2000e–3(a): It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

■ The three step *McDonnell Douglas/Burdine*[6] procedure used in discrimination/disparate treatment is applicable in retaliation cases as well. Thus, in order to establish a prima facie Title VII retaliation claim, a plaintiff must first prove that (1) she engaged in a protected opposition to Title VII discrimination or participated in a proceeding arising out of the discrimination, (2) was disadvantaged by an action of the employer subsequent to the protected activity, and (3) a causal connection between the employee's protected activity and the adverse action. *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1381 (10th Cir.1994); *see Griffith v. State of Colorado, Div. of Youth Servs.*, 17 F.3d 1323, 1331 (10th Cir.1994); *Archuleta v. Colorado Dept., of Insts.*, 936 F.2d 483, 486 (10th Cir.1991). Once a prima facie retaliation claim is made, the defendant must then set forth a legitimate, nondiscriminatory reason for the alleged adverse action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Purrington v. University of Utah*, 996 F.2d 1025, 1033 (10th Cir. 1993).

■ Plaintiffs' filing of sexual harassment complaints satisfies the first element of a prima facie case even if the defendant's actions are found to "not actually violate Title VII." *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir.1994). The Plaintiffs cannot establish however the second element—the existence of adverse employment action.

Examples of adverse employment actions include decisions that have a demonstrable adverse impact on future employment opportunities or performances, *see Berry [v. Stevinson Chevrolet]*, 74 F.3d [980, 986 (10th Cir.1996) ]*, demotions, adverse or unjustified evaluations and reports, *id; McKenzie v. Atlantic Richfield Co.*, 906 F.Supp. 572, 575 (D.Colo.1995); transfer or reassignment of duties, *Sauers v. Salt Lake County*, 1 F.3d 1122, 1127–28 (10th Cir.1993); failure to promote, *Kenworthy v. Conoco. Inc.*, 979 F.2d 1462, 1471 (10th

---

**5.** Metcalf testified as follows concerning one incident:

[I]n September of '94. .... Andy [Loomis] and Gary [Napel] were standing at the counter. And I was leaving for lunch and I turned to Gary and I said, "I'm going to grab some lunch." And he said, "No, you're not." He says, "You're going to go home and take a nap." I said, "Gary, I'm going to go grab a sandwich." And he turned to Andy and says, "She goes home every day and takes a nap with her boyfriend." And Andy looked at me and said, "Janet, you know when you qualify for leaders, you don't have to take that from him anymore."

Metcalf Dep. at 231.

**6.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Cir.1992); and unfavorable letters of reference to prospective employers, *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1164–65 (10th Cir.1977). *Fortner v. State of Kansas*, 934 F.Supp. 1252, 1267 (D.Kan.1996).

More concisely, "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997) (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)); *see also Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1381 (10th Cir.1994) (affirming summary judgment of Title VII retaliation claim because of lack of adverse employment action). Neither Metcalf nor Davis allege events, although viewed in the light most favorable to them, that meet this standard. Plaintiffs allege that after filing their complaints, Senese began compiling records and conducting investigations against them. Plaintiffs assert that MetLife should have done more to include them, especially in light of the Agency philosophy, "A successful branch based on performances achieved with teamwork, enthusiasm and a commitment." Metcalf also alleges that Loomis threatened her when she said she was bringing an attorney for the meeting on March 9, 1995 and that Loomis was less than valiant in protecting her from co-employees. Finally, Davis argues that Senese and Despain "were out to get her" as evidenced by an attempt to have Davis' car towed.

 Conspicuously lacking from these unpleasant incidents is an adverse employment action as defined above. *See Raley v. Board of St. Mary's County Comm'rs.*, 752 F.Supp. 1272, 1281 (D.Md.1990) ("Many of Raley's allegations can be attributed to an increase of predictable tension in an office after a discrimination charge is filed. This is not adverse employment."). Plaintiffs' subjective feeling that they were retaliated against is simply insufficient to create a genuine issue of fact. *Arzate v. City of Topeka*, 884 F.Supp. 1494, 1504 (D.Kan.1995). Allegations that fellow employees treated them "almost contemptuously," subjected them to "isolation treatment," and publicly criticized their work performance without just cause "fails to rise to the level of 'adverse action by the employer.'" *Beaver v. Prudential Ins. Co. of America*, No. 94–4181–DES, 1996 WL 109547, at *5 (D.Kan. Feb.1, 1996). Likewise, no Title VII liability exists because of "unpleasant relationships [they] had with [their] co-workers." *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430–31 (5th Cir.1992); *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The court thus finds that Defendants are entitled to summary judgment on Plaintiffs' retaliation claims.

### C. Constructive Discharge

 To prove constructive discharge, an employee must demonstrate that her working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Hirschfeld*, 916 F.2d at 580 (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (10th Cir.1986)). Under this standard, an employer's subjective intent to force the employee into quitting is irrelevant; it is sufficient that the employer allowed working conditions intolerable to the employee. *See Ramsey v. City and County of Denver*, 907 F.2d 1004, 1010 (10th Cir.1990). When attempting to prove constructive discharge based on sexual harassment, plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf*, 968 F.2d at 430; *see Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir.1992) ("Constructive discharge requires considerably more proof than establishing unpleasant working conditions.").

This court finds that, taking Plaintiffs' claims as true, a reasonable person would have allowed more time to see if MetLife's remedial actions improved the situation and would not have felt compelled to resign. The court reiterates that once Metcalf filed a complaint, MetLife took prompt, remedial action to end the alleged harassment and she was never sexually harassed again. This finding is amplified in the context of constructive discharge because Metcalf had returned for less than one day to the office,

after Napel had been demoted and transferred, when she decided conditions were intolerable. *See Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987) ("We agree that while 'hurt feelings' can form part of a constructive discharge scenario, it is not reasonable for an employee to resign after one day's disappointment. . . ."). Similarly, Davis requested a transfer and had already applied for employment elsewhere at about the time of Napel's demotion and relocation. Defendants' motion for summary judgment on Plaintiffs' claim for constructive discharge is accordingly granted.

### D. *Disparate Treatment*

■ Plaintiffs only mention this "claim" in a heading in the complaint. They provided neither evidence nor argument in support of this claim in their complaint, memoranda or oral argument. The court accordingly dismisses this cause of action without further discussion.

### V. Intentional Infliction of Emotional Distress

■ Defendants request summary judgment on Plaintiffs' claim for intentional infliction of emotional distress on two grounds. First, Defendants argue that any intentional infliction of emotional distress upon Plaintiffs occurred in the scope of employment and is exclusively compensable under Utah's Workers' Compensation Act (the "Act"). Second, Defendants contend that if the claim is not barred by the Workers' Compensation Act, then the alleged conduct does not rise to the level of outrageousness necessary to be compensable.

To state a cause of action for the intentional infliction of emotional distress in Utah, where there is no accompanying bodily impact or physical injury, a plaintiff must establish that "(i) [the defendants'] conduct was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality; (ii) [the defendants] intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (iii) [plaintiffs] suffered severe emotional distress; and (iv) [the defendants'] conduct proximately caused [plaintiffs'] emo-

tional distress." *Retherford v. AT & T Communications*, 844 P.2d 949, 970–71 (Utah 1992). Whether the distress is severe enough and the alleged conduct is outrageous enough to support an action for intentional infliction of emotional distress are initially legal questions for the court to resolve. *See Sperber v. The Galigher Ash Co.*, 747 P.2d 1025, 1028 (Utah 1987) (affirming summary judgment because the conduct did not rise to necessary level of outrageousness). The Restatement (Second) of Torts, relied on in Utah Supreme Court cases on this subject, *e.g., Retherford*, 844 P.2d at 977–78 n. 19; *Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961), discusses these elements:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

> . . . . .

> ... The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.

Restatement (Second) of Torts § 46 cmt. d, j.

As these definitions indicate, Plaintiffs face a difficult task meeting the Utah legal standard for an intentional infliction of emotional distress action. Plaintiffs assert that Napel's harassing of Metcalf and Despain's retaliation against both Metcalf and Davis is "atrocious and utterly intolerable in a civilized society." By any measure, Despain's conduct falls far short of the required level of outrageousness. Plaintiffs therefore fail to establish even the first element of a prima facie case of intentional infliction of emotional distress against Despain.

Napel's conduct, if true as it must be treated for purposes of this motion, is more egregious, but even assuming it was outrageous does not end the inquiry. In Utah, workers' compensation benefits usually provide the exclusive remedy for emotional as well as physical injuries occurring in the workplace. The Act provides in relevant part:

> The right to recover compensation pursuant to the provisions of this title for inju-

**1546**

ries sustained by an employee, whether resulting in death or not, shall be the exclusive remedy against the employer and shall be the exclusive remedy against any officer, agent, or employee of the employer and the liabilities of the employer imposed by this act shall be in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee ..., on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of his employment, and no action at law may be maintained against any officer, agent, or employee of the employer based upon any accident, injury, or death of an employee.

Utah Code Ann. § 35–1–60 (1996).

Utah courts have interpreted this as meaning Plaintiffs can only avoid preclusion by proving that Defendants deliberately intended to inflict an injury. *Lantz v. National Semiconductor Corp.*, 775 P.2d 937, 940 (Utah App.1989); *See Retherford*, 844 P.2d at 965 & n. 8. Metcalf has presented no evidence and has made no argument in her briefing that Napel deliberately intended to injure her but urges only that this is a factual question. The court holds that Metcalf has submitted no evidence to permit a reasonable fact finder to conclude that Napel intended to cause Metcalf to suffer emotional distress and accordingly dismisses Metcalf's claim as barred by the exclusive remedy provision of the Act. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claim for intentional infliction of emotional distress is granted.

**VI. Negligent Retention**

To prevail on a claim for negligent retention, Plaintiffs must show that MetLife was negligent in retaining Napel after it knew or should have known of his alleged harassment of Plaintiffs. *See Jackson v. Righter*, 891 P.2d 1387, 1392 (Utah 1995). Plaintiffs argue that "the potential differences between a claim of negligent retention and a Title VII claim could result in a finding of liability under one theory, but not the other." Mem. in Opp'n to Defs. Mot. for Summ. J. at 15. While such a scenario can be imagined, Plaintiffs provide no explanation as to why their

general statement applies to this case and the court is similarly at loss to see why Plaintiffs' claim for negligent retention is not wholly subsumed in its Title VII claim. The court therefore dismisses Plaintiffs' negligent retention claim.

**VII. Tortious Interference with Prospective Economic Relations**

In order to state a prima facie case on this claim, Plaintiffs must establish (1) that Napel and/or Despain intentionally interfered with Plaintiffs' existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to Plaintiffs. *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

Plaintiffs' claim against Despain can be dismissed with little discussion. Plaintiffs' only allegations against Despain concern her hostility toward them after Plaintiffs' allegations of sexual harassment surfaced. Plaintiffs provide no evidence of any specific actions by Despain that in any way affected their existing or potential clients. Moreover, both Metcalf and Davis testified that they had no knowledge of Despain interfering with any of their business relationships.

Regarding Napel, Davis similarly testified that Napel had not interfered with her customers and clients and provides no evidence or even substantive argument of Napel's interference with her prospective economic opportunities. Metcalf argues that Napel interfered with Plaintiffs' receipt of information and leads, but provides no specific facts to support this allegation. Accordingly, the court finds no genuine issue of material fact showing that Napel or Despain intentionally interfered with Plaintiffs' prospective economic relations and grants Defendants' motion for summary judgment.

**VIII. Conclusion**

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment based on Metcalf's allegation of hostile environment pursuant to Title VII is DENIED. Defendants'

Motion for Summary Judgment based on all other causes of action is GRANTED.